Dearing, *et al. vs.* The Bank of Charleston, *et al.*

No. 58.—WILLIAM DEARING, *et al.* plaintiffs in error, *vs.* THE BANK OF CHARLESTON, *et al.* defendants.

[1.] There is no Statute Law of Georgia which authorizes citizens of a foreign State to be made parties to proceedings in our Courts, without their consent, and to conclude them by a judgment *in personam.*

[2.] The Act of 5 George II., held to apply to citizens of the State who abscond or depart from the State to avoid the service of process, or to citizens of a foreign State, who, having been in the State, depart therefrom, for the purpose of avoiding service of process.

The Act of 5 George II. held to be in its spirit of force in Georgia.

[3.] The property of a citizen of a foreign State is subject to the jurisdiction of our Courts, if within the limits of the State, and may be applied, both at Law and in Equity, to the payment of his debts.

[4.] The jurisdiction of the Superior Courts of this State is co-extensive with its sovereignty, and that is limited only by its territory, and it therefore attaches upon all the property and the persons within the limits of the State; yet it is to be so exercised as to conclude by judgments none but those that are parties.

[5.] The Courts of this State have no extra-territorial jurisdiction, and cannot make the citizens of foreign States amenable to their process, or conclude them by a judgment *in personam,* without their consent. A judgment *in personam,* rendered against an inhabitant of a foreign State, in a cause wherein he did not appear, although notice was served upon him by publication, under the 2d rule in Equity, held to be a nullity as to him.

[6.] In a suit in Chancery, against a citizen of this State, who has been duly served, and also against an inhabitant of a foreign State, a decree rendered therein, held to be conclusive as between the complainant and the citizen of this State, and that it is a complete protection to such citizen, and that the decree in such suit cannot be enjoined in behalf of such foreign citizen, alone on account of the fact that he is a foreign citizen and not bound by it. He is entitled to injunction upon a case made, which, according to the general principles regulating that process, would authorize it.

[7.] A construction put upon the 2d rule in Equity, authorizing service to be perfected by publication in certain cases.

In Equity—Richmond Superior Court, decision on demurrer, by Judge HOLT, June Term, 1848.

The defendants in error filed their bill in Richmond Superior Court, charging that Samuel H. Peck owned 310 shares in the Augusta Insurance & Banking Company, which, in June, 1839, he transferred to the Bank of Charleston, So. Ca. as a security for a large sum of money, ($28,000) owing by Holcombe, Peck & Co. to the Bank.

In March, 1843, the capital stock of the Company was reduced, and a certificate was granted to A. Rose, Cashier, for 232 shares.

William Dearing having obtained a judgment against Peck, in Richmond, caused a levy and sale of these shares, as the property of Peck.

On the day of sale, (7th January, 1845,) notice was given by an agent of the Bank of Charleston, that Peck had no interest in the Stock. Henry H. Cumming became a purchaser of 165 shares, at the price of $2 per share.

On the same day a bill was filed in the Circuit Court of the United States, for the district of Georgia, to which Cumming was made a party, to restrain the Insurance Company from transferring the shares to the vendees of the sheriff, which bill was still pending when this was filed. Mr. Cumming answered the bill in the Circuit Court, disclaiming any interest in the shares, and alleging that he purchased, as agent of William Dearing, Stovall & Simmons, and Ives & Brother, who were made parties.

On 7th February, 1845, William Dearing filed a bill in Richmond Superior Court, alleging the transfer of the shares from Peck to the Bank of Charleston, to have been fraudulent, and praying a decree ordering the Insurance Bank to transfer the shares to him.

The Bank of Charleston was made a party to this bill, and being *non resident*, a rule was published for four months in the *Chronicle & Sentinel*, a newspaper published in Augusta, requiring the Bank of Charleston to appear and answer.

There being no appearance, the bill was taken *pro confesso*, and a decree taken *ex parte*, in conformity with the prayer of the bill.

The present bill of complainants below, defendants in error, alleges that the Bank of Charleston had no notice of these proceedings, and that so soon as they came to their knowledge, this bill was filed to review and set aside the decree rendered in the bill of *Dearing vs. The Bank of Charleston, et al.* The affidavit of the cashier of the Bank was attached to the bill.

William Dearing, in his answer, among other things, alleged that the Bank of Charleston did have notice, from several facts; one, that a director of the Bank of Charleston inquired of the

defendant what the notice in the *Chronicle & Sentinel* meant, when the defendant referred him to the notice itself. Another, that the paper was filed in the public reading room in Charleston, to which all the officers of the Bank had access. And another, that the President of the Bank of Charleston, in the Banking House of the "Augusta Insurance & Banking Company," in Augusta, was notified of the pendency of this suit, and agreed to defend it.

Upon the coming in of the answer, a motion was made to dissolve the injunction, which motion was refused by Judge Holt, and Dearing excepted.

MILLER & CUMMING, for plaintiffs in error.

1st. There is no equity in the bill of the said Bank of Charleston, nor any thing calling for the interference of the Court by injunction.

2d. The said Bank of Charleston was regularly and legally made party defendant to the first bill, and was concluded by the decree rendered therein. Rule of the Superior Court, *Hotchkiss*, 676, 953. 3 *Kelly*, 23. *Dudley*, 190. 3 *Binney*, 277, 417. 4 *Stewart & Porter*, 447. 12 *Gill & Johns.* 69. 10 *Yerg.* 172. *Story's Eq. Pl. s.* 135, 135 a.

3d. The stock in dispute was within the jurisdiction of the Court, and the Augusta Insurance & Banking Company, the other and material defendants to the first bill, being duly served with process, the Bank of Charleston was bound by the decree rendered. 2 *McCord's Ch. R.* 435. 3 *Gill & Johnson*, 504, 509. 1 *Atkyns*, 19. 10 *Yerg.* 172. *Story's Conflict of Laws, Sec.* 383.

4th. The Bank of Charleston had knowledge of the sale of the stock by the Sheriff—had an agent there, and was bound to know what proceeded from it, or suffer the consequences. 3 *Kelly*, 74. *Story's Eq. Pl. s.* 414.

5th. The Bank of Charleston has neither complied with the decree, nor permitted it to be complied with. *Story's Eq. Pl. s.* 406.

6th. There is no error on the face of the decree enjoined; nor does the bill of the Bank of Charleston allege the discovery of any material testimony since it was rendered. *Story's Eq. Pl. s.* 404. 12 *Gill & Johnson*, 69.

7th. The decree of a Court of Equity cannot be stayed by injunction. 4 *Iredell's Eq. R.* 481.

8th. The equity of the bill of said Bank of Charleston is denied by the answer of Wm. Dearing.

GOULD, for defendants in error.

1st. The equity of the bill is *not* sworn off.

This equity consists in want of notice of the original proceeding.

The Cashier swears, positively, that the Bank had no notice.

The President's affidavit was to the same effect, but is mislaid.

It is sworn off by *inference* and hearsay—no positive averment of notice in the answer.

The statement of Mr. Boyce's conversation, is only inference.

That of notice from the Insurance Bank, is only *hearsay.*

2d. The injunction *was properly granted.*

No man can be deprived of his rights, without a hearing.

There are cases (of *attachment*, for instance,) where, from necessity, decisions are made, *ex parte.*

But these depend only on Statutes, and can only be extended by Statute.

A *Rule of Practice* is relied on. *(Rule 2, in Equity.)*

1st. But where a party is not heard, rules against him must be construed strictly, and strictly complied with. It does not appear that this order was founded on affidavit.

2d. Courts have power to make rules of *practice*, not to legislate away substantive *rights.*

The Act of 1821 goes no further—gives no power to the Judges, to legislate by *procuration. See Const. Art.* 1, *s.* 1. *Hotch.* 500.

The Act of 1838, *(Hotch.* 676,) merely fixed the *time* of publication, which the rule left to discretion of the Court, made no provision concerning, and gave no sanction to the *subject-matter* of the rules.

The only Statute authority for this rule is in the *Statute* 5 *Geo. II. c.* 25. *Schley*, 366, '7. *See Compiler's note.*

And if that Statute reaches the case, the party is allowed seven years to impugn the decree. *Sec.* 4.

And a similar privilege is given, in other States, where a similar proceeding is authorized. 7 *Stat. S. C.* 210.

Jas. L. Petigru, for defendant in error.

The appellant ought to be enjoined from attempting to enforce the order made in his favor, because it is an *ex parte* order, not made upon the merits and contrary to the truth.

1. It is the distinction of Equity, not only to do justice, but full justice; it is not enough that the case should be plain between A. and B. If ulterior interests be involved, Equity will not disturb the condition of the parties, without taking care that all rights are preserved. Therefore, in Equity, all who are interested, must be made parties. 2 *Daniel's Pr.* 982. 16 *Vesey,* 321. *Mit.* 133.

But to bind the rights of those who have not been heard, and who are made parties only nominally, and for the very purpose of condemning them unheard, is wholesale injustice.

A decree *ex parte* is considered as the decree of the party, and he must take such a decree as he can abide by. 1 *Smith's Pr.* 416. *Gilbert's For. Rom.* 155. 2 *Mad. Pr.* 351.

This is the rule when the party has appeared, and is in contempt. When he is in contempt for not appearing, the practice is regulated by 5 *George II. Cap.* 25, which is of force in Georgia. See *Schley's Dig.* 366. But this Statute does not infringe, in the least, on the cardinal principle of Equity, that judgment should follow justice. In cases under the Statute, the party does not draw his own decree, but the Judge, on examination of the pleadings. *Geary vs. Sheridan,* 8 *Ves.* 102. 2 *Dan. Pr.* 970; and ample opportunity is given to the party affected by the decree, to make his objections within seven years. Such is the caution of Chancery, and the Statute Law of Georgia, in respect to parties who have absconded, to avoid being served, or incurred the penalties of a contempt, by disobeying the process of the Court.

When the rule, that all persons interested in the subject of the suit, should be made parties, would include some persons out of the jurisdiction, Equity modifies the form of proceeding. The fact is stated in the bill, and process prayed against the absentees, when they come within the jurisdiction. 1 *Scho. & Lef.* 240. *Story's Eq. Pl.* 78. *Osborn vs. the Bank,* 9 *Wheat.* 738, 846. It would be mockery of justice to preserve the form, at the expense of substance, and include the absentee, because it is a rule of Equity to include every party that may be affected by the de-

cree; and condemn him unheard, and without evidence, because he is absent.

If the Bank had been in contempt, an absolute decree against them, without hearing, could not be justified.

2. But the Bank was not in contempt.

The State of Georgia, and its Courts, have no jurisdiction over strangers, not within the limits of the State. Extra-territorial authority, whether attempted to be exercised by the Executive or Judiciary, is necessarily illegal. As to the public, it is a glaring usurpation on the independence of a State, to summon its citizens to a foreign tribunal. And as to the individual, it is against the first principles of reason and justice, that either in civil or criminal proceedings, a man should be condemned before he is heard. 2 *Ins.* 51. *Buchanan vs. Rucker*, 1 *Camp.* 63. 9 *East*, 192. *Pawling vs. Wilson*, 13 *John.* 192. *Borden vs. Fitch*, 15 *John.* 121. *Miller vs. Miller*, 1 *Bail.* 242. *Story's Conf. Laws*, §546.

There is, however, a jurisdiction, founded on the control of the sovereign over the thing. Such are proceedings *in rem*, recognized by the law of nations; and foreign attachments may be de fended on the same ground.

But this head of jurisdiction is necessarily limited. It is the exception. The general rule is, that to give jurisdiction, the parties must be subject to the authority, and the subject-matter within the cognizance of the Court. The struggle here, is to make the exception the rule, and because the property is within the jurisdiction, to bring *ad ejusdem examen* every question that may have reference to it.

But the distinction between the various sorts of actions, as real, personal, or mixed, will reconcile the sovereignty of the State, with the rights of strangers; using the term real action, in the sense of the Civil Law, as an action for the recovery of *jus in re.* *Story's Conf. Laws*, 530.

Between the appellant, and the Augusta Insurance & Banking Company, this was a real action; between him and the Bank of Charleston, it was personal, or mixed; for the recovery of *jus ad rem.*

If he had brought an action at law, the Augusta Company would have been the defendant, and there would have been no need of any other. The Bank of Charleston is made a defendant in Equity, because Equity seeks to do full justice; but full jus-

tice is not done by making a decree behind a party's back.   The Bank is not a party in respect to its property, for the bill proceeds on the assumption that the property is Dearing's.

3. It is gratifying to know, that neither the Act of 1838, nor the rule of Court, contravenes these principles.   They only point out the way of doing what may be lawfully done.   It was not the intention of the Legislature, or of the Court, to put the complainant in Equity on a better footing, by means of a rule and publication, than he would have been, if his bill had charged the fact, that the Bank of Charleston was out of the jurisdiction, and prayed such a decree as could be made against the parties within the jurisdiction.   1 *Story's Eq. Pl.* 81.   *Mit.* 134, 226.

*Lastly.*—If what has been done was even allowable by the letter of the Act, or the rule of Court, it would be, not only inequitable, but fraudulent, to take advantage of such regulations, to deprive a stranger of his rights, without a hearing.   *Cranston vs. Johnston,* 3 *Ves.* 170.   If the decree sought to be enjoined, were unexceptionable in every other respect, it must be enjoined on the ground of surprise.   *Story's Eq.* 120.   1 *Story's Eq. Pl.* 426.


*By the Court.*—NISBET, J. delivering the opinion.


The bill filed by Dearing against the Augusta Insurance & Banking Company, and the Bank of Charleston, charges that one Samuel H. Peck was the owner of certain shares of the stock of that Company, which was brought to sale under our Statute, making stocks liable to execution—that he (Dearing) became the purchaser, and that the sheriff of Richmond county, in accordance with the requirements of the Statute, issued to him a certificate of purchase—that the same stock had been, previous to his purchase, assigned and transferred by a firm of which said Peck was a member, to the Bank of Charleston, a corporation existing by law in the State of South Carolina, and stood on the books of said Company in the name of A. G. Rose, cashier of said Bank—that said transfer to the Bank of Charleston was without consideration, and that that Bank, by its charter, is prohibited from owning stocks—that on presentation of his certificate of purchase, the Augusta Insurance & Banking Co. declined, as required by the Statute, to transfer the stock to him.   He asks subpœnas against the Company, and the Bank of Charleston, and prays that the

stock may be decreed to be transferred to him by the Aug. Ins. & Banking Co.—that the dividends thereon accruing may be paid to him, and that the Bank of Charleston be perpetually enjoined from any farther proceedings against the Company in relation to the stock. The Aug. Ins. & Banking Co. was duly served with subpœna, and an order was taken to perfect service on the Bank of Charleston, under the 2d rule of practice in Equity, by publication in the *Chronicle & Sentinel.* Publication being made in pursuance of the rule, the Bank of Charleston was made a party, and not appearing, the bill was taken *pro confesso,* as to that corporation. Upon the hearing, a decree was rendered, *that the stock be transferred to the complainant, William Dearing, by the Aug. Ins. & Banking Co. and that the dividends thereon, from the time he became the purchaser, be paid to him.*

Before this decree was executed, the Bank of Charleston filed a bill, which is designated by the pleader, *a bill in the nature of a Bill of Review,* setting forth its title to the stock—the facts already stated as charged in Dearing's bill—that it is a foreign corporation, not subject to the jurisdiction of the Courts of Georgia; that it was wholly without notice of the pendency of Dearing's suit against it—was not a party thereto, and is not bound by the decree rendered therein, and praying that Dearing be enjoined from all farther proceedings under his decree, and that the Aug. Ins. & Banking Co. be restrained and enjoined from transferring the stock to him. Dearing answered the bill, and upon the coming in of his answer, solicitors for respondent moved to dissolve the injunction upon two grounds:

1st. Because there is no equity in complainant's bill, nor anything calling for the interference of the Court by jurisdiction.

2d. Because, if there be equity in the bill, or anything therein to authorize the injunction, the same is denied by the answer.

The presiding Judge refused the motion, and upon that refusal error is assigned; the counsel for Dearing still insisting that there is no equity in the bill filed by the Bank of Charleston, nor anything therein calling for the interference of the Court by injunction, and if there is, the same is denied by the answer.

In thus rapidly sketching the history of this cause, I have said nothing about the bill filed by the Bank of Charleston, in the Circuit Court of the United States, nor shall I again refer to it, as I consider that it has nothing whatever to do with the questions

submitted in the record.    I dismiss altogether, the question whether the equity of the bill is denied by the answer, because it will be seen that, according to the view we have taken of this cause, the consideration of that question is unnecessary.

The questions submitted for our revision by this writ of error, are important, inasmuch as they relate to the jurisdiction of our own Courts—the rights of citizens of, and corporations located in foreign States, and to that comity between independent States, which all civilized people, under different governments, have observed towards each other.    They are, however, not new.    We have the lights of many years to guide us in our pursuit of truth and justice.    They seem to us to be well settled by the opinions of learned men, and by the solemn adjudications of Courts of the most commanding authority, both in our own country and in England.    It is, therefore, with some confidence in the rectitude of our judgment, that I address myself to the discussion.

I shall inquire—

1st.    Whether the Bank of Charleston, being a corporation, existing by virtue of a charter from the State of South Carolina, and located in that State, is concluded by the decree in favor of William Dearing.

2d.    If it be not concluded by that decree, then, whether there is anything in its bill, to authorize an injunction to stay the execution of that decree ?

3d.    What is the effect of that decree ?

In relation to the first inquiry I remark, that whether the Bank of Charleston is or not concluded by the decree, depends upon the question, whether, in the case made by Dearing's bill, the Superior Court of Richmond county, had jurisdiction over a foreign corporation ?    If it had, and there was notice to the Bank of Charleston of the pendency of the suit against itself, brought in the Courts of Georgia, it is concluded, and can aver nothing against the decree in that suit rendered.

[1.]    We believe that there is no law of force in this State, authorising the making of a citizen of a foreign State a party to a suit in our Courts, so as to conclude such citizen, by a judgment or decree *in personam,* unless he voluntarily appears and defends.

And that, by the general law, and by the comity of States, the citizen of a foreign State, cannot be made a party to a suit in Georgia, so as to be estopped by a judgment against him, without

his consent. And farther, that the Bank of Charleston, whether it had or not, notice of the pendency of the bill brought against it, in the Superior Court of Richmond county, by Dearing, was not a party to the same, and is in no way affected by the decree had in that cause; and that, whatever may be its rights in and to the stock, which is the subject matter of that suit, they remain as perfect as they would be, if no such decree had been granted, and it may litigate its rights in that subject matter, in the Courts of Georgia, and according to the laws of this State, as against the claim of Dearing, or of any other person, and may, notwithstanding that decree, if by law entitled to the stock, recover from Dearing the dividends thereon, which have been, by the decree, awarded to him.

The rule of Court, the publication, and the order to make the Bank of Charleston a party, and to take the bill as confessed, do not, it is scarcely necessary to remark, make it a party, without authority of law to exercise jurisdiction over it. It is argued that the rule of Court has received the sanction of the Legislature, and therefore, it has the force and effect of law. It is a power incident to all Courts, unless restrained by law, to adopt what we usually call, rules of practice. It is unquestionably true, that the Superior Courts of Georgia, holding Chancery jurisdiction, have the right to prescribe the manner in which they will exercise that jurisdiction, unless such prescription be in conflict with the laws of the land. But I apprehend no one has, or will claim for our Court of Equity, or for any Court, the power of enlarging or limiting its jurisdiction; of creating a right, or imposing an obligation; of making or repealing laws. They have, of course, no legislative powers. The largest of all assumptions of power, as well as the most absurd, would be to undertake, by rule, to make a citizen of a foreign State subject to their jurisdiction; a power which able men have denied to Legislatures. The rule, therefore, singly considered, proves nothing in the view I now take of this question. That it subserves a valuable purpose, we shall see hereafter. Has it, however, the force of a law of the State, by virtue of legislative authority conferred upon the Courts, or by virtue of prospective legislative sanction? We think not. The Legislature never did clothe the Courts of Georgia, with any legislative authority. If the Legislature had undertaken to do this, there could be little doubt but that the Act which

conferred the power, would be unconstitutional.   The Constitution of the State inhibits to the Courts, legislative power.   The departments of the Government are made separate and distinct, and the Legislature has no authority to transfer to the Courts those powers which the Constitution devolves alone upon itself. The Act of December, 1821, makes it the duty of the Judges of the Superior Courts of this State, to convene at the seat of government once in each year, " for the purpose of establishing uniform rules of practice throughout the several circuits of this State." *Prince,* 449.   The object of this Act is manifest.   Inasmuch as the Judges of each of the circuits, had power to adopt rules of practice for their own Courts, and the practice in each circuit was therefore, in fact, or was likely to be variant from what it was in every other circuit, very much to the annoyance of the profession, and to the injury of the people, to remedy that evil, by making the practice uniform throughout the State, the Act of 1821 was passed.   It gave sanction to such rules as the Courts might rightfully adopt, and to none others.   The authority conferred upon the Judges, is, "to establish uniform rules of practice," and not to make laws or to repeal them.   We have before held, and now hold, that this Act makes all such rules of practice as the Judges may rightfully adopt, obligatory upon parties litigant in their Courts. To this extent it goes—no farther.   If, then, the rule in question be claimed to confer jurisdiction upon the Courts; to cause persons, or corporations not before liable to be concluded by their judgments and decrees, to be concluded by them; it has for such purposes, in our judgment, received no legislative sanction.   If it is claimed that it authorises the making of parties, who could not before be made in our Courts against their consent, then, we say that for such purpose it derives no sanction from the Act of 1821. So far as it is merely a rule of practice and no law, it has received the sanction and affirmance of the Legislature.   So far as it assumes to have the authority of the legislature, it is a nullity.

The Act of 1838, relied on in the argument as giving the sanction of the Legislature to the 2d rule in Equity, makes certain the time of publication, which the rule leaves indefinite, and which was therefore within the discretion of the Court.   It enacts nothing, but that publication once a month for four months, shall be held sufficient.   The remarks already made on the Act of 1821, apply with equal pertinency to this Act.   It may be considered as an

approval of the rule, so far as it operates merely as a rule of practice, and no farther.

The 2d rule in Equity is in the following words : " When a defendant or defendants reside out of a county in which a bill originates and is sanctioned, which fact must be verified by affidavit, the Court, or Judge at Chambers, shall pass such order for appearance and answer as the distance of the defendant's residence shall warrant ; service or publication of which order, according to the exigency thereof, shall be deemed a sufficient service to compel an appearance, and subsequent proceedings shall be the same as if the defendant or defendants had been served with process by the Sheriff of the county where the subpœna is made returnable.    And if it shall appear by affidavit, that a defendant is absent from the State, or cannot be found therein, service may be perfected by publication in a public News-paper, upon the order of the Court, requiring him to appear and answer the complainant's bill in such time as the Court may direct."    *Hotchkiss,* 953.    I introduce this rule here for the purpose of saying that its clauses, all except the last, obviously apply to defendants, who are within the State.    The first provisions apply to defendants who reside out of the county in which the bill originates.    The conclusion fairly drawn from the words, and others which follow, is, that the defendants intended are such as reside out of the county where the bill originates, yet within the State.    The truth of this construction is demonstrated from the fact, that in the last clause, provision is made for perfecting service on defendants " who are absent from this State, or who cannot be found therein."    It is worthy of note, that the rule no where speaks of persons or defendants who reside out of the State, and it may be well questioned, whether the convention of Judges who framed, intended it to apply to non-residents, or citizens of a foreign State.    In practice, I know, it has been extended to them.    This rule of Court is, no doubt, based upon the Act of *5th George II.* and I am disposed to believe that the Judges considered that Statute as their warrant for establishing it.

[2.] That Act, in its spirit, if not in its details, is of force in Georgia.    So far as it can be applied to our different judicial organization, our adopting Statute makes it the law of Georgia. The construction I have suggested of our rule, makes it in substance declaratory of the English Statute of George.    Now, that

Statute has been considered as legal authority to draw a non-resident within our jurisdiction, and as sanctifying the proceedings had in Dearing's bill against the Bank of Charleston. We do not think so. It applies alone to the subjects of Great Britain, and adopted by us, it applies alone to the citizens of Georgia. Great Britain has not been guilty of the national discourtesy, not to say injustice of attempting to force the subjects of a foreign State, under her jurisdiction, at the peril of losing their rights under her laws. Nor has the State of Georgia. The Act of 5 *George II.* provides, that if a defendant in Equity, against whom any subpœna or other process shall issue, shall not cause his appearance to be entered upon such process within such time and in such manner as it ought to have been entered, in case such process had been duly served, then upon its being made to appear to the Court, by affidavit, that such defendant is beyond the seas, or upon enquiry at his usual place of abode, he cannot be found so as to be served with process, and that there is just ground to believe that he has gone out of the realm or otherwise absconds, to avoid service, then the Court may make an order directing and appointing him to appear at a certain day therein named. It provides farther, that within fourteen days such order shall be published in the London Gazette, &c. and if he does not appear within the time limited by the order, or within such farther time as the Court shall appoint, upon proof of the publication, it will order the plaintiff's bill to be taken *pro confesso*, and make such decree thereon as shall be thought just, which decree may be executed by process of sequestration, &c.

In all such cases the defendant affected by the decree, if he returns to the realm or becomes publicly visible within seven years after the making of the same, shall be served with a copy of the decree, within a reasonable time after his appearance, or after his becoming visible, and if so served he may within six months after such service, petition for and have a re-hearing of the cause, and if he fail within that time, so to petition, the decree shall be absolutely confirmed and bar all claim by him. If, however, he is not served with a copy of such decree, he may, at any time within seven years from the time the decree is rendered, petition the Court for a re-hearing, and upon giving security for costs, he is permitted to answer, and the cause shall be reheard. If, however, he fails, (not being served as before stated,

with a copy of the decree,) to apply for a rehearing within seven years, he is absolutely barred.

The only other character of defendants in Equity, contemplated by the *Act of George II.* is such as being served, are brought into Court by writ of *habeas corpus.* As to them, it is enacted, that if being so brought in, they refuse or neglect to enter their appearance, according to the rules of the Court, or to appoint a clerk or attorney to act for them, the Court may appoint an attorney or clerk for them, and take such farther proceedings in the cause as would be regular, as if the party had actually appeared. There are farther provisions in this Act, but I have recited all those which characterise the persons upon which it is intended to operate, from which it is manifest that it relates to *subjects* of Great Britain, who being still within the realm, abscond to avoid regular service, or depart the realm for the same purpose, and to subjects who, being brought into Court after service by writ of *habeas corpus,* refuse to enter appearance. This construction is proven to be the true construction by the title of the Act, which declares it to be "an Act for making process in Courts of Equity effectual against persons who abscond and cannot be served therewith, or who refuse to appear." A foreign citizen, who is not whilst abroad personally subject to the jurisdiction of a State, cannot be said to abscond. It would be absurd to say that one hides from the service of process, to which he is not liable. Its truthfulness is yet more manifest from the preamble of the Act, which is in these words: "Whereas, sometimes persons have *withdrawn* themselves beyond the seas, or otherwise absconded, to avoid appearing in Courts of Equity, or being served with process for that purpose, or being brought into Court by *habeas corpus,* have refused to appear, for remedy, &c." The preamble contemplates persons who being within seas, *withdraw* beyond the seas. It is demonstrated by the proviso to the Act, which declares that it shall not extend to any person beyond seas, unless it shall appear to the satisfaction of the Court by affidavit, that such person had been in England within two years next preceding the suing out of the subpœna. If it can be construed to apply at all to subjects of a foreign State, it can apply only to such as had been in England, within two years next preceding the suing out of the subpœna. If it does apply to such persons, it cannot apply to corporations which have no lo-

Dearing, *et al. vs.* The Bank of Charleston, *et al.*

comotive faculties, and which, from their constitution, can be domiciled only in the State whose sovereignty creates them. In no view, therefore, of this Act, does it affect this case ; but if it did, under its provisions the Bank of Charleston, with notice of the decree, would have six months within which to review it, and without notice, seven years. And upon either contingency, its bill is within time. *Schley's Dig.* 366. I know of no rule of practice, or law of the State, except those laws and the rule I have remarked upon, which have any relevancy to the power claimed for our Courts by the plaintiff in error, to serve by publication, and bind by their decrees an inhabitant of a foreign State. Such a power has never been asserted by this State. Were there an Act of the Legislature conferring upon the Courts this unwonted authority, it would be the duty of this Court to enforce it, however we might hold it wanting in respect to the sovereignty of other States, and violative of that comity happily now, by the sanction of reason, justice and christianity, subsisting between the civilized nations of the earth. When I come to speak of the 2d rule in Equity again, I hope to show that, so far from violating the rights of citizens of other States, it confers upon them a privilege whilst it subserves the convenience of our own people.

[3.] A law of this State, were there such a law, which would authorize a judgment *in personam*, against the citizen of another State, could have inherently no extra-territorial effect. Because no State has authority to execute its process without its own limits, and could not, therefore, effect service upon a foreign citizen, and it is revolting to every enlightened and good man's sense of justtice, to determine his rights, who is not heard in defence of them. And because the rights of sovereignty require, that the citizen of each independent State should be liable to, and be protected by, the laws of the State to which he owes allegiance. By the comity of States, the laws of each State are respected in foreign States, unless they are prejudicial to their national rights, or to the rights of their subjects.

But not, if they are so prejudicial. The independence of every State requires that all other States should concede to it, the right of protecting its own citizens and their rights, and of enforcing obedience to their own laws. Without this, national equality would be but a name, and without this, there could be neither commerce, treaties, intercourse, nor faith among the nations. "It

is difficult to conceive, (says Mr. Story,) upon what ground a claim can be rested to give to any municipal laws an extra-territorial effect, when those laws are prejudicial to the rights of other nations, or to those of their subjects. It would at once annihilate the sovereignty and equality of every nation which should be called upon to recognise and enforce them, or compel it to desert its own proper interests, and duty to its own subjects, in favor of strangers who were regardless of both. A claim so naked of any principle, or just authority to support it, is wholly inadmissible." *Conflict of Laws*, 32. These principles deny to such municipal laws, extra-territorial effect, whether they operate upon the person of a foreign citizen who is without the State which enacts them, or upon his property situate outside of its limits. And they, therefore, repudiate the right of one State, by a judgment of its own Courts, to conclude, without his consent, the right of a foreign citizen to litigate his claim to property in its jurisdiction. This last proposition has limitations, some of which I shall presently notice. The doctrine asserted by the plaintiff in error, therefore, has no foundation in any municipal law of Georgia. I enquire, whether there is any principle of the Common Law, or of the laws of nations, or of the Federal Constitution, from which it can derive any sanction.

This question is not affected at all by the Constitution of the United States. The States of the Union, so far as the merits of this question are concerned, are sovereign. What are the limitations of their sovereignty as political communities, it would be foreign to the exigences of this cause to enquire. *Mills vs. Duryee*, 7 *Cranch*, 481. 3 *Wheat.*. 234. The Constitution of the United States provides, " that full faith and credit shall be given in each State, to the public acts, records and judicial proceedings of every other State." *Cons. U. S. arts*, 3 & 4. Declaratory of the meaning of full faith and credit, Congress has said, that the judgments of State Courts shall have the same faith and credit in other States as they have in the States where they are rendered. *Act of Congress of 26th May*, 1790, *Ch.* 11. 2 *Story's Com. on the Constitution, Ch.* 29, *secs.* 1297 *to* 1307. According to the decisions under the Constitution and law of Congress, no new power is conferred upon the States. The Constitution regulates the effect of their acknowledged jurisdiction over the persons and things within their limits. Foreign judgments are put

upon the footing of domestic judgments, as evidence.  The juris-diction of the Court in which a foreign judgment is rendered, whether it was obtained by fraud, and the right of the State in which it was rendered, to exercise authority over its subject mat-ter or the parties to it, may be enquired into.  So that the Con-stitution leaves this question where we find it—it is still a ques-tion of jurisdiction and State authority.  *Story's Conf. of Laws,* sec. 609.  *Story's Com's on the Constitution,* secs. 1297 *to* 1307. 8 *Johns. R.* 173.  6 *Pick.* 237.  9 *Mason,* 462.  6 *Wend.* 447. 9 *Serg. & Rawl.* 260.  10 *Ib.* 240.  1 *Hill. S. C. R.* 155.  2 *Ib.* 302, 358.  4 *Conn. R.* 380.  *Latine vs. Clements, adm'r,* 3 *Kelly,* 428, 429.

This is not the case of a creditor seeking to enforce payment of a debt due by a foreigner, by seizing and applying his proper-ty, found within this State.  The jurisdiction of our Courts of Law and of Equity, over property of a non-resident debtor, for such a purpose is unquestioned.  It may be attached or sold to pay debts by a decree in Chancery.  Our Statute laws subject it by process of attachment.  And the right to do so is recognised by the laws of nations, and is a necessary incident of sovereignty. Not only may the property of a non-resident be so applied, but his credits also.  Money, for example, due him by third persons. As at law in our State by garnishment.  This is an exception to the general proposition, that the rights of an inhabitant of a for-eign State, in property within the jurisdiction of another State, are not concluded by a judgment there.  A judgment in attach-ment, is however, in the nature of a proceeding *in rem,* and is conclusive only upon the property seized.  It has not the ¡effect of a judgment *in personam,* and has no extra-territorial effect, ex-cept as to that property.  In the Courts of the State where the debtor resides, it is not evidence of a debt which can ¡be there enforced upon him personally.  If he appear and defend, the rule is usually held different, but able jurists have doubted whether appearance would enlarge the effect of a judgment.  See the able opinion of *Mr. Ch. J. Parsons, in Bissell vs. Briggs,* 9 *Mass. R.* 468.  In all such cases as I am now considering, the idea of notice to the defendant, is studiously maintained; so averse are the Courts from giving judgment—from exercising a rightful ju-risdiction even, "behind one's back."  For in attachment, the seizure of the property is considered as notice to all the world,

514        SUPREME COURT OF GEORGIA.

Dearing, et al. vs. The Bank of Charleston, et al.

as in proceedings in Courts of Admiralty. *Story's Conflict of Laws,* 440, 441 *Henry on Foreign Laws,* ch. 8, 9, 10, *page* 54 *to* 71. *Douglass vs. Forest,* 4 *Bing. R.* 686 *to* 701. 5 *Mason R.* 35. *Phelps vs. Holker,* 1 *Dall.* 261. 5 *Johns. R.* 37. 13 *Ib.* 192. 8 *Ib.* 86. 9 *Mass. R.* 462. 3 *Burge on Col. & For. Law, part* 2, *ch.* 24, *page* 1016 *to* 1019.

I have stated that this is not a proceeding in Equity, by a creditor, to apply the property of a non-resident debtor. It is important to know precisely the relations of the parties to each other, and to the subject matter. Then, briefly, the record discloses that William Dearing was a judgment creditor of Samuel H. Peck, and believing that certain stock, which he had owned, of the Aug. Ins. & Banking Co. which stood on the transfer books of that Company, in the name of A. G. Rose, cashier of the Bank of Charleston, was liable to his judgment, caused it to be levied on and to be sold by the sheriff, he becoming the purchaser. The Ins. & Banking Co. declining to execute a transfer to him, he brings his bill against that Company, to compel a transfer, and making the Bank of Charleston a party, asks that it may be perpetually enjoined from prosecuting its claim to the stock. Now this is a proceeding by a creditor in the first instance, to apply the property by levy and sale under execution, of his resident debtor, to the satisfaction of his debt. Acquiring a title, as his bill charges, to that property, his bill is filed against the Ins. & Banking Co. who alone could make the transfer, for the purpose of compelling the transfer, to which bill the Bank of Charleston, holding a claim to the stock adverse to his, growing out of a prior conveyance to it, and being a foreign corpora tion, is sought to be made a party, and to be concluded by the decree. The sum of it is, that in a proceeding between citizens of this State, the inhabitant of a foreign State is collaterally called in to litigate its rights in the subject matter, and it is held by the plaintiff in error, that being so called in, and service being perfected on it by publication, its rights are forever concluded by the decree rendered in that proceeding.

From this statement, it is plain that the recognised law, which enables a creditor to subject the property of his non-resident debtor to the payment of his debt, does not apply to this case. The relation of creditor and debtor does not obtain between Dearing and the Bank of Charleston.

The position of the plaintiff in error, is rested upon the general

doctrine that the jurisdiction of our Courts may be exercised over all property within its limits, and when exercised, is conclusive upon all the world. It must be final, and bind all claimants, both in our own State, and in all foreign States, provided the claimants have notice.

[4.] That a decree will bind all the citizens of Georgia, who are parties to it, generally, is true. That judgments *in rem* bind the citizens of foreign States, is true; that jurisdiction over *persons* who are citizens of a foreign State, who may be within the State of Georgia, may be exercised to a limited extent by our own Courts, is also true. And it is farther true, that the jurisdiction of our Courts is co-extensive with the sovereignty of the State, embracing the property and persons within its limits. But it is not, in our judgment, true, that the exercise of jurisdiction over property, does, (except in a certain class of cases to which this case does not belong;) conclude the rights of a foreign citizen in and to that property. If the Legislature of Georgia had authorised upon personal service a judgment *in invitum*, against a foreigner, the local tribunals might give effect to it. But there is, as I hope I have proven, no law which goes to that extent in Georgia. "A nation, (to use the language of Mr. Story,) within whose territory, any personal property is actually situate, has as entire dominion over it while therein, in point of sovereignty and jurisdiction, as it has over immoveable property situate there. It may regulate its transfer, and subject it to process and execution, and provide for and control the uses and disposition of it, to the same extent that it may exert its authority over immoveable property." *Conflict of Laws,* 462. 1 *Atk.* 19. 3 *Gill & Johns.* 504, 509. 2 *McCord Ch. R.* 435.

[5.] This is the broad and comprehensive rule on the one hand— on the other hand, the rule is firmly fixed, *that no sovereignty can extend its process beyond its territorial limits, to subject either persons or property to its judicial decisions.* This is the rule, by the laws of nations—by the Common Law, and is recognized by the American Courts. *Dig. Lib.* 2 *tit.* 1, 1, 20. 1 *Boullenois Pr. Gen.* 1, 2, *page* 2, 3. *Vattel, B.* 2, *Ch.* 8, *sect.* 84. *Picquet vs. Swan,* 5 *Mason R.* 35, 42. *Conflict of Laws,* 450, *sect.* 539.

[6.] Between these two propositions there is an apparent conflict —none, I apprehend, real. To apply them to the case before us. The first asserts the jurisdiction of the Superior Court of Richmond county, over the stock, the property which is the subject matter of Dearing's bill. Its *situs* is in Georgia—the sovereignty

of the State is over it, and the jurisdiction of the Courts is co-extensive with its sovereignty.    The second denies to the sovereignty of Georgia, the right to extend its process beyond the limits of the State, and to subject foreign persons to its judicial decisions. The former seems to conclude the Bank of Charleston—the latter to exempt it from the operation of the decree.    If the decree can bind the Bank of Charleston at all, it must be as a judgment *in personam.*    It cannot be pretended that, as to the Bank, it is a judgment *in rem.*    May not this apparent conflict be reconciled by referring to the effect of the acknowledged jurisdiction of the Court over property, *upon citizens of the State?*    A decree of the Court, vesting property in a complainant, is not conclusive upon *a citizen* who was not served, and was not a party to that decree.    Yet is the jurisdiction of the Court the less absolute over property, because of that fact?    Just so, as to foreigners; if they are not parties to a decree, they are not bound by it.    Yet is the jurisdiction of the Court over their property, the less absolute because of that fact?    The truth is, that at the door of every temple of the laws in this broad land, stands justice, with her preliminary requirement upon all administrators—" you shall condemn no man unheard."    The requirement is as old at least, as *magna charta.*    It is the most precious of all gifts of freedom, that no man be disseised of his property, or deprived of his liberty, or in any way injured, *"nisi per legale judicium parium suorum, vel per legem terræ."*    Now, you cannot bring a foreigner into the Courts of Georgia, to answer to a proceeding against him personally, without his consent.    Against it lies an absolute prohibition, founded in the rights of sovereignty, and sanctioned by the usage of the civilized States of the world.    If, then, he does not come in voluntarily, served or not, he is no party—he is condemned unheard, and the rights of sovereignty are but political and judicial figments.    Whilst, therefore, the jurisdiction over property is conceded, as a necessary attribute of sovereignty, it must be so exercised, as to conclude no one unheard.    When it is exercised, as in this case—as in the case of citizens, just now put, what then? Why, its decrees bind the parties defendants and protect them, and it clothes the parties plaintiffs with rights which may remain forever good, but which are liable to be impugned by any one who was not a party, by proceedings properly instituted for that purpose, whether citizen or foreigner.    And to this end, the halls

Dearing, *et al. vs.* The Bank of Charleston, *et al.*

of justice are always open. But more of this hereafter. In *Picquet vs. Swan*, Judge Story declares, "the Courts of a State, however general their jurisdictions are necessarily confined to the territorial limits of the State. Their process cannot be executed beyond those limits, and any attempt to act upon persons or things beyond them, would be deemed an usurpation of foreign sovereignty, not justified or acknowledged by the laws of nations. Even the Court of *King's Bench in England*, although a Court of general jurisdiction, never imagined that it could serve process in *Scotland, Ireland*, or *the Colonies*, to compel an appearance, or justify a judgment against persons residing therein, at the time of commencing suit. This results from the general principle, that a Court erected within, or for a particular territory, is bounded, in the exercise of its power, by the limits of such territory. It matters not whether it be a State, a Kingdom, a Country or a City, or other local district. If it be the former, it is necessarily bounded and limited by the sovereignty of the Government, itself, which cannot be extra-territorial; if the latter, then the judicial interpretation is, that the sovereign has chosen to assign this special limit, short of his general authority."

Again, he says, " Nor would it, in such case, vary the legal result, that the party had actual notice of the suit, *for he is not bound to appear to it*. No sovereign has a just right to issue such a notice, and thereby acquire a jurisdiction to draw a party from his own proper forum, *ad aliud examen. 5 Mason*, 35.

[7.] If the *2d Rule in Equity* attempts, at all, to draw foreign citizens within the jurisdiction of the State, which we disclaim, it is upon the principle, as it is called, of a citation *viis et modis*. That is, to cite the non-resident defendant to appear, by publication, in the *London Gazette*, as in England, or in the *Chronicle & Sentinel*, at Augusta, as in this case, or by posting an edictal citation at the Key in Leith, or at the market cross at Edinburg, and the pier and shore of Leith, as in Scotland—citation, *by ways and means*, or *by hook and by crook*, as our learned and facetious brother Petigru had it in the argument. Some nations, it is true, have resorted to such devices. But they have been held, even when sanctioned by Municipal Law, not to confer jurisdiction over non-resident defendants. In respect to suits *in personam*, instituted upon this plan, Mr. Story says, " there is no

pretence for saying that such modes of proceeding can confer any legitimate jurisdiction over foreigners who are non-residents, and who do not appear to answer the suit, whether they have notice of the suit or not." *Conflict of Laws,* 457, '58. At Common Law, this question is settled, in the leading case of *Buchanan vs. Rucker.* In that case, a judgment was obtained in the island of Tobago, against a party "*formerly* of the city of Dunkirk, and now of the city of London," who was cited to appear, and servic · perfected by nailing a copy of the declaration on the Court-House door in the island of Tobago. Upon which service, he failing to appear, judgment was given against him. This judgment was attempted to be sustained in England, upon the ground that the local law of Tobago, authorized it. Lord Ellenborough, upon the trial in England, said, "By persons absent from the island, must necessarily be understood, persons who have been present and within the jurisdiction, so as to have been subject to the process of the Court. But it can never be applied to a person, who, from aught that appears, never was present within, or subject to the jurisdiction. Supposing, however, that the Act had said in terms, that though a person sued in the island, never had been present within the jurisdiction, yet, that it should bind him, upon proof of nailing up the summons at the Court-House door, how could that be obligatory upon the subjects of other countries? *Can the island of Tobago pass a law to bind the rights of the whole world?* Would the world submit to · such an assumed jurisdiction?" 9 *East,* 192 *to* 194. In the case of *Wills vs. Duryee,* the questions were different to what they are here, and turned upon different principles. In that case, Mr. Justice Johnson delivered a dissentient opinion, from which I extract the following strong and true paragraph—"There are certain eternal principles of justice, which never ought to be dispensed with, but when compelled by some Statute. One of these is, that jurisdiction cannot be justly exercised by a State over property not within the reach of its process, nor over persons not owing them allegiance, or not subjected to their jurisdiction, by being found within their limits." 7 *Cranch,* 481. In *Grignon's Lessee vs. Astor, et al.* the Supreme Court of the United States declare, "this is the line which denotes jurisdiction, and its exercise, in cases *in personam*— when there are adverse parties, the Court must have power over the subject-matter and the parties." 2 *Howard's S. C. R.* 338. In

*Borden vs. Fitch*, Thompson, Chief J. discusses the question under consideration with great ability. He says, "to give any binding effect to a judgment, it is essential that the Court should have jurisdiction of the person, and the subject-matter—the want of jurisdiction makes it utterly void and unavailing for any purpose." 15 *Johns.* 141.

It would be an imperfect conception of the view we have endeavored to present of this case, to suppose that we consider the decree in favor of William Dearing, in the light of an interlocutory judgment, so far as the Bank of Charleston is affected by it, which may be opened for a re-hearing, at the instance of that corporation. We hold it a *mere nullity.* In the language of Parsons, Chief J. in *Bissell vs. Briggs*, "*no credit*," is to be given to it. According to Judge Reeve, in *Grumon vs. Raymond*, 1 *Day's Conn. R.* 40, it is, "as though there was no Court." Being a nullity, it in *no way* affects the rights of the Bank. If it had been rendered in this State by authority of law here, it would be conclusive on the Bank, whilst in Carolina and in all other States, it would be held a nullity; but being without authority of law in Georgia, it is equally void here as elsewhere. 10 *Coke*, 70. 9 *East*, 192, 194. 3 *Ves.* 170. *S. C. 5 Ves.* 276. 1 *Star.* 525. 2 *Barn. & Adol.* 951. 5 *Bing. N. C.* 208. 4 *Barn. & Cress.* 625. 5 *Clarke & Fin.* 1, 20, 21. 3 *Perr. & Dav.* 143. 8 *Johns.* 194. 15 *Ib.* 121. 9 *Mass.* 462. 7 *Cranch*, 481, 486. 5 *Mas.* 35. 8 *Mass.* 473. *Story's Confl. of Laws, sec.* 546, 547, 548. *Kirby*, 119. 5 *Johns.* 2, 41. 1 *Day, Conn. R.* 429 *to* 449. 2 *McCord's Ch. R.* 436, 437.

It has been already intimated, that if the citizen of a foreign State should appear and defend a suit, and a judgment *in personam* should be rendered against him, he would be concluded by it. He may waive his exemption from the jurisdiction, and being heard, could aver nothing in any tribunal, against the judgment. Directly to this point, see the case of *Picquet vs. Swan*, 5 *Mason*, *R.* 35, *and* 1 *Denio*, 91.

Nor does the opinion we now express make void the 2d rule in Equity. For certain purposes it remains in full effect. It cannot legalise a judgment against a non-resident, who has never been within the State, but has the same useful operation that the *Statute 5 George II.* has in England. It provides the means of making citizens of this State parties, who abscond or depart

from the State to avoid service of the process of the Court, and thus avoids delays of justice, by compelling complainants to proceed, and defeating pleas in abatement for non-joinder of parties. A foreign citizen in Georgia, is amenable to the jurisdiction of our Courts. If such an one, having been in the State at the time suit is instituted against him, departs from the State to avoid service, and to evade the jurisdiction of the Court, I am not prepared to say but that he may be made a party by publication under this rule, and would be concluded by a judgment. What is the extent of the jurisdiction of our Courts, over a foreign citizen, resident in Georgia, or temporarily within its limits, I shall not now inquire. I mean only to say, that service of process upon him, in the case put, under the rule, would make him a party, and the judgment would bind him to the extent of that jurisdiction. Again, the rule is wise and beneficial, and even benignant, in this, that it affords the means of notice even to citizens of a foreign State, who have never been within the State, and are not subject to our sovereignty and to the processes and judgments of our Courts, by which, if they think proper so to do, they may appear and answering, avoid the necessity of instituting new and independent proceedings. It extends to them valuable facilities. So that we do not make void the rule, but establish it.

The effect of the decree, as a judgment against the Augusta Insurance and Banking Co. and upon the stock and dividends awarded to Dearing, is disclosed necessarily, in what has been already said. The jurisdiction over the property and the company, is not denied. As between the Company and Dearing, it is conclusive. It settled all the equities between them, and must operate as a protection to the Company, not only against Dearing, but also as against the Bank of Charleston. In this cause, it seems to stand in the position of a *custodium* of the stock—it is treated in the decree, as the depository of the dividends. The decree directs it to transfer the one, and pay the other to Dearing. Being compelled by a Court of competent jurisdiction to do these things, it must be protected by its judgment, and being notified and heard, it must also be concluded. As between Dearing and the Bank of Charleston, he takes the decree, "*valere quantum valere possit.*" He certainly gets by his purchase and the execution of his decree, the interest in the stock, whatever that may be, which Peck, the defendant in execution, had. If the Bank

of Charleston has a title to the stock, better by the laws of the land than his, or an incumbrance upon it prior in time and superior in legal effect, to his title, or to his claim, as the creditor of Peck, Dearing's title or claim must yield to the title or the incumbrance of the Bank, whenever that institution shall properly assert its title or its incumbrance.

It only remains for me to inquire whether there is anything in the bill filed by the Bank of Charleston, to authorize the Court to enjoin the execution of Dearing's decree? We have seen that that bill was filed to set up the claim of the Bank to the stock in question, and the dividends due thereon, and to enjoin the execution of Dearing's decree. Upon the doctrine settled by this decision, to-wit: that as to the Bank of Charleston, it is no decree; the transfer unde. it is a matter, in itself, of no consequence. The plenary execution of it, would not make it a decree. Then, as now, it would be a nullity. The ground upon which the injunction is asked, is, that the Bank of Charleston was not notified— is not amenable to the jurisdiction of the Court, and is not concluded by the decree. As to notice, that is not to be considered, since we hold, that with or without notice, the Bank is not concluded. The fact that the Bank of Charleston is not concluded by the decree, because an inhabitant of a foreign State, is not, of itself, sufficient to authorize the injunction. No other ground or cause for the injunction is set forth in the bill of the Bank. At the same time that we so rule, we do not say that the Bank, upon a case made, would not be entitled to an injunction against the execution of the decree, or against Dearing, when it is executed. The injunction must depend upon those general principles which regulate that process. Suffice it to say, that the bill of the Bank does not make a case, which, upon those principles, calls for the exercise of the power of the Court by injunction. The injunction must be dissolved and the decree proceed. Whether the bill of the Bank be, or can be made by amendment, sufficient to assert and protect the rights of the Bank of Charleston in the premises, or whether a new bill ought to be brought, are questions which are not made in this record, and upon which, therefore, we express no opinion.

Let the judgment be reversed and the injunction be dissolved.