No. 57.—SEABORN B. WATTS, plaintiff in error, *vs.* JOSEPH R. KILBURN, defendant.

[1.] If there be an attesting witness to an instrument, his evidence of its execution is the best, and must be produced, if in the power of the party.

[2.] If the witness is dead, or blind, or insane, or infamous, or has become interested, since the execution of the paper, or is beyond the process of the Court, or is not to be found, after diligent search, the course is, to prove his hand writing.

[3.] But if the subscribing witness merely makes his mark, proof of the handwriting of the party executing the instrument, may be adduced.

[4.] When a judgment lien has attached on personal property, which is removed by the defendant in execution, to another State, and sold, it may be levied on and sold under execution, if brought back again to this State.

[5.] If an insolvent debtor, pending suit, runs personal property to another State, for the purpose of defeating his creditor, and there sells it to one who has full knowledge of the fraudulent purpose for which it has been removed, the contract will be declared void by the Courts of this State, in a contest between the vendee and creditor.

Levy and Claim, in Merriwether Superior Court. Tried February Term, 1849, before Judge HILL.

Daniel Turrentine being in failing circumstances, either pend-

Watts *vs.* Kilburn.

ing the suit, or after judgment against him, in favor of Joseph R. Kilburn, in Merriwether Superior Court, clandestinely removed his property, consisting of negroes, to the State of Alabama, where he sold them to Seaborn B. Watts, who purchased with a full knowledge of the facts stated, and the fraudulent intention of Turrentine to avoid the payment of his debts. Watts subsequently brought three of the negroes back to the State of Georgia ; Kilburn caused his execution to be levied, and Watts interposed his claim.

On the trial at February Term, 1849, the above facts were in evidence before the Jury. There was also some evidence, to prove that Watts and Turrentine had rescinded their trade, and Watts had delivered up two of the negroes, (not those levied on,) and also the bill of sale.

The plaintiff in *fi. fa.* offered in evidence the bill of sale, which was attested by a witness residing in the State of Mississippi, who subscribed his name by making his mark. The plaintiff proved the hand writing of the maker. Counsel for claimant objected to the paper, on the ground that this was not the best evidence. The Court overruled the objection, and claimant excepted.

The Court charged the Jury, that if the claimant, living in Alabama, for a valuable consideration, purchased of the defendant in execution, who was in failing circumstances, negroes which had been run off from Georgia, pending suit, or after judgment, to defraud creditors ; and if the claimant knew that the negroes were carried off with the view and for the purpose of avoiding the payment of his debts, the sale was void, as to such creditors ; and if brought into this State by the purchaser, and placed within the reach of the lien of the judgment obtained, or to be recovered, there being no evidence of what the law of Alabama is upon the subject, it is presumed to be the same as in Georgia, and such property would be subject to such lien. The Court farther charged, that if there was an after agreement between the parties, to rescind the contract and deliver up all the negroes, and there was a part execution thereof, by delivery of two of them, the failure to deliver the other three, vested the title to them in the defendant in *fi. fa.* sufficient to sustain an action of trover, or make them liable for defendant's debts.

To all of which charge of the Court, claimant, by his counsel,

Watts *vs.* Kilburn.

excepted; and upon these several exceptions, error has been assigned.

W. T. COLQUITT, represented by B. H. HILL, for plaintiff in error.

O. WARNER, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The first error complained of in this case is, that the Court permitted a bill of sale to personal property to be read in evidence to the Jury, by proving the hand writing of the party making it, without proof that the subscribing witness could not be produced, or his hand writing established; this being held unnecessary, as the witness made his mark, and resided, at the time of the trial, in the State of Mississippi.

The general rule on this subject is, that if there be an attesting witness to an instrument, his evidence is the best, and must be adduced, if in the power of the party.

[2.] But if the witness be dead, or blind, or insane, or infamous, or interested since the execution of the paper, or beyond the process or jurisdiction of the Court, or not to be found, after diligent search and inquiry, the course is, to prove his hand writing. Distinguished Jurists have thought, that proof of the hand-writing of the party executing the instrument, is better evidence of the execution, than proof of the hand writing of the attesting witness. 3 *Binn.* 192. 2 *Johns.* 451. 11 *Mass.* 309. Hitherto, however, a technical and artificial rule has prevailed over right reason, in relation to this subject.

[3.] But in the case under consideration, there was no hand writing. The name of the witness is written by another, and he makes a cross mark. In this, there is nothing distinctive to fix its identity. Who can know it? Upon this point then, we think the Court was right in treating such a signature as a nullity, and allowing the hand writing of the party to be proved. His admission that he executed the paper, would have answered the same purpose.

[4.] The next objection is, that the Court charged the Jury, that if property was removed to another State, and sold by an

insolvent debtor, for the purpose of defeating his creditor, either pending suit or after the judgment lien had attached thereon, and was there bought, with the full knowledge of this fraudulent intent, and brought back to Georgia by the purchaser and levied on, that the property was subject to the execution.

That it would be liable under these circumstances, provided the judgment lien had already attached, we apprehend there can be but little doubt. A judicial sale in another State, might, perhaps, divest the lien, and protect the title of the purchaser. This, however, would depend upon a different principle, altogether, from that of a voluntary conveyance. Upon this branch of the proposition then, we hold that there is no rule of comity or international law, that would defeat or impair the rights of a judgment creditor thus situated. That his lien would be suspended only, while the property remained abroad, and that it would revive whenever it was brought back again; the preference and priority of the parties being settled and determined by the law of the domicil of the debtor.

" The law of the place where the contract is made," said Chief Justice *Marshall*, in delivering the opinion of the Court on an important case, " is, generally speaking, the law of the contract; i. e. it is the law by which the contract is expounded. But the right of priority forms no part of the contract; it is extrinsic, or rather, a personal privilege, dependent on the law of the place where the property lies, and where the Court sits which is to decide the cause." *Harrison vs. Sterry*, 5 *Cranch*, 289, 278. *See also*, 12 *Wheat.* 361, 362.

" If," says *Huberus*, " the law of another country is in conflict with that of our own State, we should, in such a case, rather observe our own law, than the foreign law." *Liber* 1, *tit.* 3, §11.

Lord *Ellenborough* has laid down a similar doctrine. " We always import," says he, " together with their persons, the existing relations of foreigners, as between themselves, according to the laws of their own country, except, indeed, where those laws clash with the rights of our own subjects here; and one or other of the laws must necessarily give way; in which case, our own is entitled to the preference. *Potter vs. Brown*, 5 *East*, 124, 130.

Chancellor *Kent* maintains the same rule in his Commentaries. That where the *lex contractus* and the *lex fori*, as to conflicting rights acquired in each, come in direct collision, the comity of

nations, must yield to the positive law of the land. *In tali con-flictu magis est, ut jus nostrum quam jus alienum servemus.* 4 *Kent's Com. Lecture* 39.

Whether a judgment lien, before or after levy, could be enforced against property removed to a foreign jurisdiction, we will not undertake to determine. In a country like this, composed, it is true, of different States, but all united under one government, and constituting a national confederacy, and especially, with a population so migratory as ours, the comity of States should be carried to its utmost limits. It may well be doubted, whether that clause in the Constitution of the United States, which requires full faith and credit to be given in each State, to the judicial proceedings of any other State, and which gives to Congress the power to prescribe the effect thereof, has received that liberal and beneficent interpretation intended by its authors. Why may not the national Legislature declare that a judgment lien, in one State, shall have a like effect in every other State, and empower the proper Courts in each, to enforce the same through their proper officers, by execution or otherwise; due regard being had to the rights and interests of third persons?

[5.] As to the fraudulent removal and sale of the property abroad, *before* the judgment lien has attached, our opinion is, that the judgment below should be affirmed on this point.

It is argued, that the *mere knowledge* of Watts, that Turrentine had removed his slaves from Georgia to Alabama, to defeat Kilburn, his creditor, would not vitiate his purchase of the property. It is contended that the illegal act, on the part of Turrentine, was complete, by the removal of his property out of this State; and that the contract between him and Watts was a new matter altogether, and no part of the original scheme; and consequently, not affected by it, although it was known to Watts when he bought.

In the first place, we are not prepared to concede even this doctrine; it strikes us as rather at war with sound sense, as well as sound morals. Lord Chief Justice *Eyre*, in *Lightfoot vs. Terrant*, (1 *Bos. & Pull.* 351,) maintained the contrary of this proposition, with great cogency. And Mr. Justice *Best*, in *Forbes vs. Cochrane*, (2 *B. & Cres. R.* 448, 471,) held that contracts, contrary to the law of nature or the law of God, against good morals or religion, or in fraud of the laws or subjects of another country,

Watts *vs.* Kilburn.

should be deemed nullities, whenever affected by such considerations, notwithstanding they may be valid by the laws of the place where they are made.

But the view we take of this matter is this: Watts, himself, *participated* in the fraudulent act. The fraud consisted not merely in the transfer of the slaves beyond our State boundary, for then the creditor could have pursued them, and by attachment or otherwise, made them subject to his debt. The fraud was not consummated until the sale in Alabama; and Watts being a party to this transaction, with full knowledge of all the facts, he may be considered as conspiring with Turrentine, to defeat Kilburn. A conveyance like this would be void, as between our own citizens, in our own Courts. We see no reason why it should not be equally null, as between the present parties. The most powerful discouragement should be held out against the perpetration of such attempts; otherwise, there will be no security for debts, especially in our border counties, if a foreign sale can sanctify the fraud, notwithstanding the purchaser not only knew of the fraudulent *design, on the part of the contriver and conductor,* but connected himself with the original scheme, by aiding and abetting in its execution. Viewing this sale then, as being clearly in fraud of the rights of the creditor, it ought not to be protected by the Courts of the country whose laws it was designed to evade.

And having come to this conclusion, it is unnecessary to discuss the other exception, as to the rescision of the contract. We do not think, however, that the objection to the charge of the presiding Judge, upon this point, was well taken; and shall content ourselves, therefore, by simply affirming its judgment.