GEORGE EUBANKS, and others, plaintiffs in error, vs. FRANCIS A. BANKS, Administrator of Alfred Eubanks, deceased, AMBROSE EUBANKS, and others, defendants in error.

[1.] While the *lex loci*, as a general rule, governs the construction of contracts, questions of marriage, of legitimacy, and the rights of succession to property, it is subject, in practice, to the great controlling idea, that it will not be enforced, by comity, if it involves anything immoral, contrary to general policy, or violative of the conscience of the State called on to give it effect.

[2.] In the absence of a direct judicial decision by the Courts of North Carolina, as a precedent, a statute of that State will not be construed here as allowing of *no excuse* for a second marriage if the first husband be alive, (though reported and believed to be dead) and as bastardizing the issue of such marriage by necessary consequence.

[3.] A marriage took place in North Carolina in 1818. The following year the husband deserted the wife, and went to Tennessee, a distance of eight hundred miles, where he remained, unheard of, for nineteen years and a half. During his absence, to wit, in 1828, the wife, still in North Carolina, married another man. This second marriage was never dissolved nor declared null by the judgment of any Court; but cohabitation under it continued until one of the parties to it died: *Held*, That, upon common law principles, which are presumed to prevail in North Carolina as in Georgia, the second marriage was not absolutely void, nor the issue of the same illegitimate; but that the issue were legitimate, and capable, under the laws of Georgia, of inheriting from their half brother, a son of their father by a former marriage.

In Equity. In Morgan Superior Court. Tried before Judge Wm. M. Reese. May, 1866.

Alfred Eubanks, a citizen of Georgia, and resident of the county of Morgan, in said State, having departed this life in the year 185–, intestate, without wife or child, or any lineal descendant, his lawful administrator, Francis A. Banks, having settled up his debts, was about to proceed with the distribution of his estate, consisting of real and personal property, when a dispute arose amongst the persons claiming to be brothers and sisters and half brothers and sisters of said Alfred. Not being able to settle this controversy, George Eubanks, David Eubanks, and James M. Hatch and his wife Sarah, filed their bill of complaint in the Superior Court of Morgan county against said Banks, the administrator of Alfred Eubanks, Ambrose Eubanks, Asa Eubanks, and others, the children of one Thomas Eubanks. In this bill, while fully and distinctly admitting the children, and their representatives, of Thomas Eubanks, named as defendants, to be entitled to inherit the estate of Alfred Eubanks, on account of being his full and lawful brothers and sisters by a father and mother, dead many years before the death of Alfred Eubanks, these complainants claimed also the right to inherit with the defendants, on the ground that they were the legitimate children of Thomas Eubanks, father of said Alfred, by a second wife, one Betsey Eubanks, formerly Betsey Wilson or Yarbrough. This claim was resisted by defendants, on the ground that the complainants were not legitimate children of Thomas Eubanks, but illegitimate children, because said Thomas and the mother of complainants were

never lawfully married, and could not be so lawfully married or have lawful issue.    To sustain the claim of complainants, they submitted the following testimony:

1. The interrogatories of *William Wilson*, who testified as follows: That he is a resident of Fayetteville, Cumberland county, North Carolina; was married to Betsey Yarborough, a daughter of Joseph Yarborough, in said county and State, in the year 1818; lived with said Betsey something more than one year; left her, about the year 1819, in said county, and went to Tennessee; remained there nineteen years and six months, during which time he did not write to or have any communication with his wife, said Betsey. After an absence of eight years, he had reason to believe that said Betsey intermarried with one Thomas Eubanks; that he left North Carolina immediately upon his separation, not remaining there, in Cumberland, one day; that he never lived in the same county or neighborhood with said Betsey since she married Thomas Eubanks; that he has never seen her since he left her in 1819, and has had no communication whatever, with her; that he did make an affidavit about the 9th day of October, 1857; that he can neither read nor write, and never made an affidavit, to his knowledge, that said Betsey was married in less than eight years after he left her; that if he ever made an affidavit other than this, it was incorrectly read to him, or he did not know its contents, and expressly stated to the officer taking the affidavit, that he was absent after he separated from his said wife, nineteen years and six months, and more than eight years after leaving her, heard that she was married; that he lived in Tennessee nineteen years and six months, immediately after his separation from said Betsey, since which time he has lived in Cumberland county, North Carolina; that he now lives fifty-five miles from said Betsey, and for nineteen years and six months lived more than eight hundred miles from her.

2. The interrogatories of *Elizabeth Eubanks*, who testified as follows: That the complainants are her children by

52

Thomas Eubanks, to whom she was married in 1828; that Thomas Eubanks is their father, and that they were begotten and born in lawful wedlock; that they are half brother and sister of said Alfred; that she was married, in 1818, to one William Wilson, who, in about one year, left her, and went to parts unknown to her; that she heard it reported, some three or four years after his departure, he, Wilson, was dead; that she intermarried with Thomas Eubanks in about nine years after Wilson's departure; that her maiden name was Yarborough; that she married Wilson in 1818, and Eubanks in 1828 at the house of Thomas Lasseter, a justice of the peace; that she is about 59 years of age.

3. The interrogatories of *Joseph Yarborough*, who tesfied that he knew the father and mother of complainants; was present at their marriage, about 1828; that he knew William Wilson, but did not know where he was when Thomas Eubanks married the mother of complainants; heard it reported at that time he, Wilson, was dead, having left the country many years before; that he is the uncle of complainants.

4. The interrogatories of *Frederick Yarborough*, who testified that he was present when William Wilson and his sister, Betsey, were married; that it was in 1818, at his father's house; that they lived together, between two or three years, when Wilson quit his wife, went to the Western country, of whom he saw nothing until about two years since, when he met him with a woman and five children, which he claimed to be his wife and children; that he is the brother of complainants' mother, and is nearly sixty-nine years of age.

5. The interrogatories of *Matthew Yarborough*, who testified that he was present at the marriage of Elizabeth Yarborough, his sister, with William Wilson, which occurred in 1818, at her father's house, in the county of Cumberland; thinks that Wilson left his wife in two or three years after his marriage aforesaid; would not be positive; that Wilson left that section of the country when he left his wife; that

he has never since seen him, and knows not when he returned, or that he ever returned.

6. The interrogatories of *Daniel Ansley*, who testified that he had known Elizabeth Eubanks, widow of Thos. Eubanks, thirty-five years; that he was present at her marriage with Thomas Eubanks, in 1828, in his house, in Chatham county, North Carolina; that Thomas Lassetee, a justice of the peace, performed the marriage ceremony; that said Eubanks and Elizabeth lived together as man and wife, from their marriage to the death of Thomas Eubanks; that complainants were the children of said marriage; that Thomas Eubanks was sixty years of age at the time of said marriage; that said Elizabeth was known at the time of marriage as Elizabeth Wilson; that he never knew of William Wilson being in the county of Chatham until after the death of Thomas Eubanks; that he came to said county in 1852 or 1853, where he remained only a short time.

7. The interrogatories of *Robert Fawcett*, who testified that he has resided in Haywood, Chatham county, North Carolina; has had a large acquaintance with the people of said county, since 1830; that said Wilson married and settled in Haywood in the fall of 1849, which was the first time he ever heard of him.

8. The interrogatories of *Elias Bryan*, who testified that he was a resident of Haywood, Chatham county, N. C.; knew the citizens thereof for the last twenty years, and never knew William Wilson in said county previously to 1848 or 1849.

Defendants submitted the following testimony, to show that the complainants were not lawful heirs of Alfred Eubanks:

1. The interrogatories of *Harriet Eubanks*, who testified that she had known the mother of the complainants for more than thirty-two years; when she first knew her, she was known as Betsey Wilson, and was said to be the wife of William Wilson, and living separately from him; that she does not know when she married with Wilson, nor when she

separated from him, and never saw Wilson; that she knew Thomas Eubanks, the father of complainants, and knows that he "took up" with said Betsey early in the fall of 1828; that when she first knew Betsey Wilson, she had a little "girl daughter" named Isabella Wilson, aged about four years, which child was only about five or six years of age when Betsey Wilson took up with Thomas Eubanks; that she has heard Thomas Eubanks say he had married Wilson's wife and knew she was Wilson's wife; that she is forty-eight years of age, and married the brother of Ambrose Eubanks, and has lived in Chatham county, North Carolina, since 1820.

2. The interrogatories of *Willis Poe*, who testified that he knows the mother of complainants. When he first knew her she was a widow; that she and her husband had parted; that they lived separate in his neighborhood, more than four or five years; that Wilson was living with another woman, within 2½ miles of his wife, by which woman he had two children, one of whom was large enough to visit his mill, and was seven or eight years of age; that he did not know Thomas Eubanks nor anything of his taking up with Betsey Wilson; that he knows nothing, except from rumor, of the marriage of William Wilson and Betsey Wilson.

3. The interrogatories of *James Wilson*, who testified that he knew Betsey Yarborough before her marriage with Wilson; that after said marriage, Wilson and his wife, Betsey, did not live together more than twelve months, when they separted, and she went to Chatham county; that where Wilson went, he does not know; that he does not know in what year Wilson separated from his wife; that he heard of him frequently as being in Fayetteville about one year after the separation, and hears he is there yet; that when he came back, it was generally known he was living in Fayetteville; that in about twelve months after Wilson left, said Betsey took up with Thomas Eubanks; that it was generally known he, Wilson, was living in Fayetteville at that time, when she, Betsey, took up with Eubanks; that a short time after Betsey took up with Eubanks, she, Betsey, told witness "she was

afraid to talk out, for fear of the law;" that he, witness, lived within three miles of Thomas Eubanks when he married Betsey Wilson; that Wilson and wife, Betsey, after the marriage, lived about thirty-five miles from him; that he never saw Wilson, but frequently saw Betsey.

Defendants further offered in testimony the following exemplified statutes of North Carolina:

1. The Act of 13th December, 1790, as follows: "An Act to restrain all married persons from marrying again while their former wives or husbands are living.  Be it enacted by the General Assembly of the State of North Carolina, that if any person now married, or who shall hereafter marry, doth take to himself or herself another wife or husband, while his or her former wife or husband is still alive, every such offence shall be felony, and the persons so offending shall suffer death as in cases of felony: Provided, always, that this Act shall not extend to any person or persons whose husband or wife shall continually remain beyond seas for the space of seven years together, nor to any person or persons whose husband or wife shall absent him or herself in any other manner for the space of seven years together, —such person or persons not knowing his or her husband or wife to be living within that time."

2. An Act to amend the Act of 1790, which amending Act, passed in 1809, declares that if any person now married, or who shall hereafter marry, doth take to him or herself another husband or wife, while his or her former wife or husband is still living, every such offender shall be adjudged a felon, without benefit of clergy, and shall suffer death.

The evidence being now closed, the presiding Judge charged the jury as follows:

" Gentlemen of the jury.—If you believe, from the testimony in this case, that William Wilson was married to Betsey Yarborough, in the year 1818, or about that time; that he parted from his wife; that while he was so parted, and in life, his wife, the said Betsey, intermarried with

Thomas Eubanks, and had by him, as her children, the complainants, (her former husband, from whom she was not legally divorced, being still in life) then, I charge you, under the laws of North Carolina, which are before you, and which must, in this case, determine the question of legitimacy, and the right to inherit from Alfred Eubanks, that the complainants cannot recover. Further, I charge you, that, even if the right to inherit from Alfred Eubanks was to be determined by the laws of Georgia, or the *lex fori*, that the clause in the Penal Code of 1833 relied on by the complainants, will not relieve them if they are illegitimate by the laws of North Carolina, as this Act and the one on which it is founded, passed long before, only relieve the children of persons marrying in the State of Georgia, and who, by a second marriage, have violated the laws of Georgia."

Under this charge, the jury returned a verdict for defendants; and complainants' counsel excepted, in proper form, to all the rulings of said presiding Judge.

N. G. & A. G. FOSTER, for plaintiffs in error.

BILLUPS and FANNIN, for defendants.

HARRIS, J.

The facts of this case are novel, and the point involved is one of much importance. Elizabeth Yarborough, the mother of complainants, married Wilson in the spring of 1818. He deserted her in about a year, and went into Tennessee, a distance of eight hundred miles, and remained there, unheard of, for nineteen years and a half before returning back to North Carolina. He never saw her after he abandoned her, or had any communication, direct or indirect, with her. In 1828, Elizabeth Wilson was married to Thomas Eubanks, Wilson having before this been reported to be dead. The plaintiffs in error are the children of this latter marriage.

Thomas Eubanks had another set of children by a previous marriage. He died several years since.

His children by the first marriage seek, by the bill of the administrator of Ambrose* Eubanks, (one of the children of Thomas Eubanks by his first marriage) to deprive plaintiffs in error, children of the half blood on the paternal side, of their right to inheritance, by alleging their illegitimacy as a necessary consequence of the facts stated.

To sustain the idea of the illegitimacy of the plaintiffs in error, we have been referred to the acts of the Legislature of North Carolina, to-wit, an Act passed in 1790, entitled " An Act to restrain all married persons from marrying again, whilst their former wives or former husbands are living." This Act provides that those who violate it shall be guilty of felony, and suffer death therefor as in cases of felony; but that it shall not extend to any person whose husband or wife shall continually remain beyond sea for the space of seven years together, nor to any person or persons whose husband or wife shall continually remain beyond sea for the space of seven years together,—such person or persons not knowing his said wife or her said husband to be living within that time.

The Act of 1790 was re-enacted in 1809, *omitting* the proviso.

Upon the facts in the case, under the Act of 1790, we think it is clear that its penalty could not have affected Mrs. Eubanks for her second marriage, her first husband being alive.

[1.] It is a familiar principle of the common law that the *lex loci* is the general rule adhered to by Courts, in construing contracts, questions of marriage, legitimacy, and rights of succession to property. It has been adopted by so many States, that it now constitutes an essential portion of what is denominated international jurisprudence. It has lost none of its efficiency as a rule by this; but on the contrary, it has made, thereby, a bond of amity between nations; yet, it is subject to a great controlling idea, that, upon comity, it will

*Alfred.—Rep.

not be enforced if it involves anything immoral, contrary to general policy, or violative of the conscience of the State called on to give it effect. With this subordination, comity requires that we should give effect to the laws of North Carolina; not otherwise.

[2.] If it had been the design of the Act of 1809, by omitting the proviso contained in the Act of 1790, to allow of no *excuse* for a second marriage, the first husband being alive, but reported and believed to be dead, and, as a necessary consequence, to bastardize the issue of such second marriage, we are forbidden by our own policy and conscience from so interpreting the laws of a sister State, without other and better evidence than that furnished by these Acts. No *direct* judicial decision upon these Acts has been produced. There should have been some case cited where a marriage, made as this was after the lapse of more than seven years, had been, by judgment of the Court, held to be *null and void ;* and, further, that the issue of such marriage was illegitimate, before we were called on to say such were the laws of North Carolina.

Surely, when in Georgia the issue of such second marriage of Elizabeth Eubanks, had they been born on the soil of Georgia, though the marriage was in North Carolina, would not be held by our Courts as illegitimate, but would be protected from such a stigma, as also from deprivation of rights of inheritance, we ought not to be hasty to draw the conclusion that her laws and policy differ from our own.

[3.] On the contrary, we think the Act of 1809 but threw the matters of excuse back upon those recognized by the principles of the common law. Under it, such a marriage as the one we are considering was excused from the penalties of bigamy; *and unless the marriage was dissolved by the judgment of law,* the marriage was treated as legal, and the issue held to be legitimate. At most, the second marriage in this case, by the common law, would have been held simply *voidable.*

If so, what a striking illustration is furnished by Black-stone, (1 *vol. Com.*, 434, and quoted by Story in his *Conflict of Laws, sec.* 114,) in the case of *incestuous marriages.* They were *voidable only during the lives of the parties.* If not avoided during the lives of the parties, by judgment of a Court, these marriages were deemed valid to all intents and purposes, and the issue held legitimate.

In the case under consideration, no such odium as that of incest attaches to this second marriage—a marriage made before five or six witnesses; the parties dwelling together for many years as husband and wife; the marriage made under the sanction of a judicial officer; no indictment against her for bigamy; none for living in a state of adultery; no step taken to avoid this marriage; at length, Eubanks dies, and Wilson reappears in North Carolina with another wife and four or five children.

Why, if the marriage here was illegal and voidable, attach, in this case, severer penalties (to be followed by such terrible consequences to its innocent offspring) than in the revolting case of incest? There can be no sound reason, on principle, why the two cases shall be distinguished. As Eubanks, the father of the two sets of children claiming, equally, distribution of the estate of Ambrose* Eubanks, is dead, having died before this disreputable attempt was made by the older set to bastardize the younger, and his last marriage not having been annulled by any legal proceeding, nor declared, by any statute brought to our notice, to be absolutely null and void; we will not (nor does comity require it of us) go the length asked, of declaring complainants illegitimate: but, presuming that the Courts of North Carolina are governed by common law principles common to that State and this, we hold, upon the testimony in the case, that the marriage of Elizabeth Wilson with Thomas Eubanks was legalized by them; and being so, that the children of that marriage are legitimate, and being children of the half blood on the father's side, are

---

*Alfred.—REP.

entitled to distribution with the children of the whole blood
of Thomas Eubanks, in the estate of Ambrose* Eubanks.

Let the judgment below be reversed.