CAMPBELL *v.* ALLEN, administrator, *et al.*
ALLEN, administrator, *et al. v.* CAMPBELL *et al.*

Nos. 17496, 17497. ARGUED JUNE 11, 1951—DECIDED JULY 10, 1951—
REHEARING DENIED JULY 24, 1951.

*Ralph T. Clark* and *F. E. Clark,* for plaintiff in error.

*McClure & Ramsey, George L. Goode,* and *Ben T. Wiggins,* contra.

ALMAND, Justice. ■ We first consider the assignments of error on the exceptions pendente lite, as complained of in the cross-bill of exceptions.

Prior to the adoption of Rule 19 of the Rules of Practice and Procedure for Appeal or Review (Ga. L. 1946, pp. 726, 744; Code, Ann. Supp., § 24-3364), there was no statutory provision or rule of court that gave to the respondent or his counsel in motions for new trial the opportunity to inspect the brief of testimony prepared by counsel for the moving party before approval by the court, nor any notice as to when the same was to be approved by the court, whereby he or his counsel had opportunity to inspect the contents of the brief or insist that it was not complete. Rule 19 rewrites Rule 47 of the Superior Court Rules (Code, § 24-3347), which provides that a brief of the testimony in the cause shall be filed by the party applying for a new trial, under the revision and approval of the court. Under Code § 70-302, where an order is taken to hear a motion for a new trial in vacation, the brief of evidence must be presented for approval within the time fixed by the order, and at the time fixed for the hearing the judge may finally approve the brief, or he may in his discretion adjourn the hearing to another date in vacation, with power to approve the brief of evidence; but neither under the statute nor the rule was the respondent or his counsel, prior to the act of 1946, given any right to inspect the brief of evidence for errors of omission or commission, or any specific notice as to

the time and place the brief of evidence would be submitted for approval to the trial judge, in order that the respondent might file objections to its contents or to its incompleteness. In the adoption of Rule 19, which rewrites Superior Court Rule 47 by inserting the following two sentences between the first and last sentences—viz., "Before presenting a brief of the testimony to the court for approval, the attorney whose duty it is to prepare it shall give written notice to the opposite party or his attorney of record of his intention to present the brief of the testimony to the trial court for approval at a certain time and place. No such brief of the testimony shall be approved by the trial court unless the opposite party or his attorney of record shall have been given such written notice or shall, in writing, have waived such notice"—it was the purpose and intent of those writing the new rule to remedy the evil existing in the trial court in approving a brief of evidence in motions for new trial, by giving to the respondent or his counsel an opportunity to be present at the time and place the brief of evidence prepared by counsel for the moving party was presented to the court for approval, in order that such respondent or his counsel might voice objections to the contents or lack of contents of the brief. To insure the respondent or his counsel of such opportunity, it was provided that the court *shall not* approve the brief of testimony unless the opposite party or his counsel has been given a notice in writing, or such notice has been waived in writing, of a certain time and place at which the brief is to be submitted.

In the instant case, at the time and place fixed by the court for a hearing on the motion for a new trial, of which counsel for the respondents had notice, such counsel appeared, and before the court approved the brief of the testimony, agreed in writing that it contained "a correct transcript and brief of the evidence adduced upon the trial" of the case. It thus appears that the purpose of Rule 19 was fully satisfied. We are of the opinion that a literal application of Rule 19 under the facts and circumstances of the case at bar would be unjust, where it clearly appears that the beneficent purpose of the rule had been fully satisfied. Code § 102-106 provides that one may waive or renounce what the law has established in his

behalf. Such waiver may result from conduct. *Grant, Alexander & Co.* v. *Savannah, Griffin & North Ala. R. Co.*, 51 *Ga.* 348 (2). The rule under consideration was made for the benefit of respondents and their attorneys in motions for new trial. The plaintiffs in error in the cross-bill, by agreeing to the transcript of the evidence, received the same benefit as if the rule had been literally complied with. After such action, they cannot invoke the penalties of the rule for non-compliance, when they have suffered no injury, but on the contrary have received the benefit that the law intended to give them. Compare *Clements* y. *Ledden*, 132 *Ga.* 430 (64 S. E. 460).

To paraphrase the Latin maxim "Cessante ratione legis, cessat beneficium legis" (meaning, the reason for the law ceasing, the benefit of the law ceases)—where the real purpose of the rule is satisfied, the application of the rule itself ceases. Rules of court should be construed with reference to the reason upon which they rest, so as to promote the object which the framers of the rules had in adopting them, and to insure as far as possible just results in all cases and minimize possibilities of injustice being done to the parties.

In view of the foregoing, we are of the opinion that the trial judge did not err in approving the brief of evidence and in denying the plaintiff's motion to dismiss the motion for a new trial.

■ Under the pleadings and the evidence, the matrimonial domicile of the parents of Richard Donald Campbell, and the place of his birth, were in the State of Pennsylvania. The laws of the State of Pennsylvania and the decisions of its courts were pleaded, but no proof of the same was made in the trial court. In the absence of such proof, we assume that common-law marriages are recognized in Pennsylvania. Under the undisputed facts appearing in the record, Pam R. Campbell and Ophelia Scott in 1930 began living together under an agreement of marriage, though they were never united by any ceremony. They held themselves out to the public as husband and wife and lived together as such until Pam R. Campbell's death in 1947. Richard Donald Campbell was born on June 19, 1933, and Pam R. Campbell at all times recognized him as his son. All the essential elements of a common-law marriage are shown.

However, the record shows that at the time Pam R. Campbell and Ophelia Scott began their common-law relationship, and until his death, he had a living wife by reason of a ceremonial marriage, which had never been dissolved. Under the common law, such purported marriage was bigamous and void, and the child of such bigamous marriage was illegitimate. 1 Bishop's Marriage, Divorce and Separation, § 725; 2 Schouler's Marriage, Divorce, Separation and Domestic Relations (6th ed.), § 1127. The only modification of the common law at the time of the formation of the American Union was the statute of 1 James c. 11, which provided that, in the prosecution of one for bigamy, it was a good defense to show that the opposite spouse of the former marriage had been absent overseas and unheard of for more than 7 years at the time of the second marriage, and the children of the second marriage were deemed to be legitimate. The provisions of this statute of 1 James appeared in substance in Georgia's first Penal Code of 1817, and appear today as Title 26, Chapter 56 of the Code of 1933. Georgia abandoned the common-law rule that made the children of a void marriage illegitimate, and adopted the civil-law rule that the issue of certain void marriages, before they were annulled, were to be considered legitimate. This change as to certain void marriages appeared in the Code of 1863 (§ 1657), and without any modification now appears as § 53-104, as follows: "Marriages of persons unable to contract, or unwilling to contract, or fraudulently induced to contract, shall be void. The issue of such marriages, before they are annulled and declared void by a competent court, shall be legitimate." It thus appears that the State of Georgia declared a policy as to the status and issue of void marriages contrary to the common law, and it is our duty to apply the laws of this State rather than the rules of the common law in determining the status of Richard Donald Campbell. *Dearing* v. *Bank of Charleston*, 5 *Ga.* 497 (48 Am. D. 300); *Watts* v. *Kilburn*, 7 *Ga.* 356; *Reeves* v. *Southern R. Co.*, 121 *Ga.* 561 (49 S. E. 674, 70 L. R. A. 513, 2 Ann. Cas. 207). The trial judge determined the status of Richard Donald Campbell upon application of the lex fori, and we will determine his status according to the laws of this State.

If the marriage between Pam R. Campbell and Ophelia Scott had been ceremonial, there is no question but that the decision in this case would be controlled by the ruling in *Eubanks* v. *Banks*, 34 *Ga.* 407, *Perkins* v. *Levy*, 158 *Ga.* 896 (124 S. E. 799), and *Griffin* v. *Booth*, 176 *Ga.* 1 (167 S. E. 294). The *Eubanks* and *Perkins* cases were cited with approval in *Connor* v. *Rainwater*, 200 *Ga.* 866, 871 (38 S. E. 2d, 805).

It is argued that there is a distinction between a void ceremonial marriage and a void common-law marriage, and that Code § 53-104, in providing that the issue of a void marriage are legitimate before such marriage is annulled and declared void by a court of competent jurisdiction, has reference only to a ceremonial marriage, this contention being based on the view that the purpose of nullifying a ceremonial marriage is to cancel the record of the marriage, whereas in a common-law marriage there is no record to erase. We are unable to see any distinction between a void ceremonial marriage and a void common-law marriage, or why the issue before annulment of the former are legitimate and the issue of the latter are illegitimate. The word "marriage" in Code § 53-104 must be construed with reference to the use of the word in the Code sections immediately preceding. Section 53-101 defines the essentials of a marriage, and this court has repeatedly recognized common-law marriages as complying with these essentials. *Peacock* v. *Peacock*, 196 *Ga.* 441 (26 S. E. 2d, 608). Code § 53-102 specifies those persons who are able to contract a marriage, and lists as one of the disabilities to contract a marriage, a previous marriage undissolved. In the use of the word "marriages" in Code § 53-104, dealing with "Marriages of persons unable to contract," it cannot be said that the legislature, in providing that the issue of such marriages before annulled will be legitimate, intended it to apply only to ceremonial marriages. This view is strengthened by Code §§ 26-5601, 26-5602, and 26-5603, which, after defining bigamy or polygamy as knowingly having a plurality of wives or husbands at the same time, and that the second marriage shall be void, declare that "the issue of such second marriage born before the commencement of any prosecution for polygamy or within the ordinary time of gestation thereafter, shall, not-

withstanding the invalidity of such marriage, be considered as legitimate." The provisions of the three sections last referred to first appeared as one section in the Penal Code of 1817, and as one section in the Code of 1863, and their purpose was to legitimate the issue of all bigamous marriages born or conceived before commencement of any prosecution. We know of no rule of the common law, or any statute of this State, that would prevent the prosecution of one for the offense of bigamy where the second marriage was a common-law marriage. See *Allen* v. *State*, 17 *Ga. App.* 431 (87 S. E. 681); In re Meredith's Estate, 279 Mich. 298 (272 N. W. 683); Hiler *v.* People, 156 Ill. 511 (41 N. E. 181); 2 Wharton's Criminal Law (12th ed.), Ch. 50.

This court has repeatedly held that an attempted bigamous marriage is void and may be disregarded without being decreed void by a judgment of court. *Gearllach* v. *Odom*, 200 *Ga.* 350, 353 (37 S. E. 2d, 184), and cases cited. In the case last cited, this court held that a court of equity would entertain an action to annul a bigamous ceremonial marriage, and in the opinion it was said: "Since equity jurisdiction is for the relief of parties where the general rules of law would be deficient in protecting from anticipated wrong or affording relief for injuries done, we know of no sound reason in law or equity why equity should not take jurisdiction and grant relief from the injury complained of that will be both adequate and complete. While it may well be doubted that there can be successfully maintained such a proceeding in equity as an action to annul something that, as a matter of law, is null and void already, yet the designation of the instant petition as one for annulment is no reason why a decree as prayed, declaring the marriage void, should not be granted. Such a decree is essential to the full protection of this petitioner from injury that is and well may be anticipated as a result of the void marriage ceremony." If equity can entertain an action to annul a void second ceremonial marriage, we know of no reason why it could not take jurisdiction where the marriage sought to be annulled was a void common-law marriage. The only distinction between the two proceedings is that, where the marriage was ceremonial, part of the relief is cancellation of the public

record of the marriage, and in the other there is no record to cancel; but the consequences as to property rights or outward status of the parties as well as children, requiring by judicial decree the avoidance of the marriage, are the same in both cases. It is generally recognized that a marriage may be annulled by a judicial decree, for the sake of the good order of society as well as for the quiet and relief of the injured party. Martin's Heirs *v.* Martin, 22 Ala. 86; Palmer *v.* Palmer, 162 N. Y. 130 (56 N. E. 501); In re Newlin's Estate, 231 Pa. 312 (80 Atl. 255); Moffitt *v.* Moffitt, 246 Ala. 174 (19 So. 2d, 722).

We hold that, under the provisions of Code § 53-104, the child of a bigamous common-law marriage, born before such marriage was annulled or declared void by a court, is legitimate and is the lawful heir of his deceased father. Under the rulings in the *Eubanks, Perkins,* and *Griffin* cases, supra, Richard Donald Campbell, being the legitimate son of his deceased father, was entitled to his father's distributive share in the estate of Haskell Campbell, and it was therefore error for the court to exclude him from receiving a one-fourth interest in the distribution of Haskell Campbell's estate. The cases of *Curlew* v. *Jones,* 146 *Ga.* 367 (91 S. E. 115), and *Irving* v. *Irving,* 152 *Ga.* 174 (108 S. E. 540), relied on by the defendant in error, do not require a contrary ruling. In the *Perkins* case, 158 *Ga.* 896 (supra), this court distinguished these two cases; and the reasons here, being the same as there, need not be repeated. However, we do wish to make reference to a statement appearing in the opinion in the *Irving* case, which was not decided by a unanimous court, and that is, that the provision of Code § 53-104 as to "marriages of persons unable to contract" does not have reference to bigamous marriages. This statement must be taken in connection with the question before the court, and that was, whether the birth of a child born of a bigamous marriage revoked the will of the putative father. The ruling of the court was that such a birth must be the result of a valid marriage. However, if the language used by the court be construed as holding that § 53-104 does not legitimate the issue of a bigamous marriage under any circumstances, such construction is not in harmony with the full-bench rulings in the *Eubanks* and *Perkins* cases, supra.

Nor is any ruling in *Williams* v. *Lane,* 193 *Ga.* 306 (18 S. E. 2d, 481), or *Christopher* v. *Christopher,* 198 *Ga.* 361 (31 S. E. 2d, 818), contrary to the ruling here made. In the *Williams* case, supra, the question before the court was whether the will of the testatrix had been revoked by reason of her marriage subsequent to the making of her will. It appears from the facts in that case that the propounders of the will were the children of the testatrix by a purported common-law marriage of the testatrix and one Sam Williams, who, until May 26, 1921, had a previous undissolved marriage. The will was executed in 1921. After Williams' marriage had been dissolved in 1921, the testatrix and Williams entered into a ceremonial marriage. The contention was made that the testatrix and Williams having lived together as common-law husband and wife, and the will having been made after the beginning of such relationship, there had not been a revocation of the will by any subsequent marriage. This court—after stating that Sam Williams being a party to an undissolved marriage, "No agreement purporting to constitute a common-law marriage, nor cohabitation of the man and woman while holding themselves out to the public as husband and wife, nor birth of children to such parties, will constitute or prove a common-law marriage between them when the man was legally married to another woman throughout the period of such cohabitation"—held that the ceremonial marriage between the testatrix and Williams revoked her will. The court there was dealing with the status of the parties to an attempted common-law marriage and the effect of the marriage on the subsequent execution of a will by one of the parties under Code § 113-408, and was not dealing with the rights of children, the issue of a void marriage, under Code § 53-104. In the *Christopher* case, supra, the question before the court was whether the plaintiff, a woman, was entitled to a divorce, alimony, and attorney fees. It was held that, under the evidence, it appeared that the plaintiff had been previously married, and that a purported divorce between herself and her husband was void; and, not being legally married to the defendant, she was not entitled to any relief. That case did not involve any question as to the legitimacy of the issue of a void marriage, and the reference in the opinion

to Code § 53-104, and *Irving* v. *Irving*, 152 *Ga.* 174 (108 S. E. 540), was only incidental to the question of who are able to contract marriage, and these authorities were not cited in support of any ruling necessary to a decision of the case.

Under the foregoing rulings, it was error for the court to overrule the defendant's motion for a new trial.

*Julgment affirmed on the cross-bill of exceptions; reversed on the main bill.  All the Justices concur, except Duckworth, C. J., and Candler, J., who dissent from the ruling on the main bill.*

DUCKWORTH, C. J., dissenting.  The decisions in *Eubanks* v. *Banks*, 34 *Ga.* 407, and *Perkins* v. *Levy*, 158 *Ga.* 896, cited in the majority opinion, involved ceremonial marriages.  Such marriages have been dealt with and provided for by the legislature.  When one reads the various Code sections providing for the issuance of marriage licenses, by whom the ceremony must be performed, the return by him of the license to the ordinary and the recording thereof, as well as many other regulations, he must be impressed with the thought that he had found all of our law providing for marriages, yet common-law marriages are legal in this State, without conforming to such statutory requirements.  Code § 53-104 refers to marriages in the same way that all other legislation refers to them.  It is reasonable, therefore, to assume that it, like all other legislation on the subject, refers to ceremonial marriages and not to common-law marriages.  There is good solid reason for so construing it, for it declares that the issue of the void marriage there mentioned, before it is "annulled and declared void. by a competent court," shall be legitimate.  Who ever heard of a suit in Georgia courts to annual or declare void a common-law marriage?  There is no record that I know about of such proceeding.  Such marriages are conceived in secret, and are generally brought out in the open only when it is thought they will get something for nothing, or protect from legal difficulties.  Undoubtedly the legislature knew this when approving the Code section.  How can the true wife and children or others institute action to annul something they do not know exists?  On the other hand, ceremonial marriages—the only kind the legislature has undertaken to regulate—are wit-

nessed by others, and put on the public record, thus informing the world of their existence. The humane objective of § 53-104 to protect the innocent child is laudable as relates to ceremonial marriages, but when extended to children of bigamous common-law marriages a floodgate for fraud and injustice to others, including legitimate children, is opened. It would permit dishonest mothers of illegitimate children to frame a story of common-law marriage to deceased men and thereby imperil the security of their lawful wives and children.

While neither *Williams* v. *Lane,* 193 *Ga.* 306, nor *Christopher* v. *Christopher,* 198 *Ga.* 361, dealt with this question, and consequently they are not authority for this dissent, yet the expressions therein, strongly indicating agreement with this dissent, were approved by all members of the court. Though *Irving* v. *Irving,* 152 *Ga.* 174, is by only five Justices, it seems to be sound in so far as common-law marriages are concerned, and it supports this dissent.

I therefore think that the law should not sanction the wilful open defiance of the law that one with a living spouse practices when he pretends to enter into an unwritten unrecorded and unwitnessed bigamous marriage. No decision of this court has heretofore so held, and I think safeguards against fraud, defiance of law, and the welfare of a lawful spouse and legitimate children dictate that we should not now so hold. I would affirm the judgment.

I am authorized to state that Candler, Justice, joins in this dissent.