33893.   KEHELEY *v.* KOONCE *et al.*

Decided April 11, 1952.

*Paul L. Lindsay Jr., Rache Bell,* for plaintiff in error.

*W. E. Harclerode, Camp & Camp, William T. Boyd,* contra.

SUTTON, C.J. ■ The court did not err in overruling the motion to dismiss the petition. The petition was brought on the theory that the child was illegitimate. Under the act of 1941 (Ga. L. 1941, p. 301; Code, Ann. Supp., § 74-405), the consent of the mother alone in such a case will suffice. Whether or not the mother's consent was valid or was withdrawn were defensive matters to be considered on the objections to the adoption, and were not shown by the allegations of the petition itself.

■ According to section 3 of the revised adoption law of 1941 (Ga. L. 1941, p. 301; Code, Ann. Supp., §§ 74-403 through 74-406), "Except as otherwise specified in this section, no adoption shall be permitted except with the written consent of the living parents of a child." In the case of *Sessions* v. *Oliver,* 204 *Ga.* 425 (50 S. E. 2d, 54), it was held that the father's consent to the adoption of a child by a third party, the custody of the child having been awarded by a divorce decree to the father, was the equivalent of an abandonment of the child such as would forfeit the father's right of custody to the mother, and that the father's consent to the adoption was not revocable for the purpose of regaining his right to custody unless sufficient legal reasons were shown, citing *Durden* v. *Johnson,* 194 *Ga.* 689 (22 S. E. 2d, 514), and *Bently* v. *Terry,* 59 *Ga.* 555 (27 Am. R. 399), both of which were habeas corpus cases, holding that parents voluntarily surrendering their rights to custody and control of their children may not revoke such a release without cause. It was said in *Glendinning* v. *McComas,* 188 *Ga.* 345, 349 (3 S. E. 2d, 562): "The present [adoption] case must not be confused with a habeas corpus case. In a case of that character the welfare of the child is the paramount issue, and no question as to termination of the parental relation is involved; whereas in an adoption proceeding the question is whether all the facts, including the interest of the child, are sufficient to warrant the court in completely severing and destroying the natural relation between the parent and child and substituting an artificial status between the child and another person as parent. Manifestly, the rights of the natural parent are of more importance in the latter case than in the former."

In the present case, it is not only doubtful that the mother's consent was freely and voluntarily given, with full knowledge of the facts, but there were also considerable changes in the circumstances of the consenting person between the time the consent was given and the time it was sought to be withdrawn, before the final order of adoption, such as would show that the consenting parent no longer had "just cause to be relieved of the care, support, and guardianship" of the child. (Code, Ann. Supp., § 74-413).

The evidence showed that Mrs. Hudgins, a divorcee with a child of five years by her previous marriage, married William Keheley on March 8, 1950, but separated from him in May of 1950, when she learned that he had been and was still married to one Dorothy Castile of Birmingham, Alabama. Keheley claimed that his previous marriage to Dorothy Castile was void because of her incapicity due to a previous undissolved marriage, but nevertheless sought and obtained a divorce from her on May 31, 1951. In June of 1950, Mrs. Keheley discovered that she was pregnant, and had to quit her job in July. She talked to a Mrs. Mirriam at the Child Welfare Association, a child-placing agency, with regard to the adoption of the child to be born, and was informed that the child could not be accepted for adoption until Mrs. Keheley's marital status and her right to release the expected child were clarified. In September, 1950, Mrs. Keheley sought the advice of Ben Camp, an attorney at law, who advised her that her marriage was void and that her expected child would be illegitimate. On her behalf, he filed a petition on December 8, 1950, for the annulment of Mrs. Keheley's marriage to William Keheley, but it does not appear that any further action was ever taken in that case. Mrs. Keheley was without funds or means of support after quitting her work and during her pregnancy, and she was under mental stress, crying frequently, and staying in her room at her sister's house most of the time. One Evelyn Hinton contacted Mrs. Keheley by telephone, stating that through a friend, the secretary of one of the petitioners, she had learned the the petitioners wished to adopt a child. She told Mrs. Keheley that the petitioners would give the child a home and a name, and would pay the medical and hospital expenses of Mrs. Keheley. Evelyn Hinton carried on negotiations with

Mrs. Keheley and with Mrs. Koonce and, at Mrs. Keheley's request, her attorney also interviewed the Koonces. The child was born on December 9, 1950, and Mrs. Keheley did not then see him or even know the sex of the child. She notified Ben Camp, who was then representing the adopting petitioners, that the child had been born, and he came to the hospital on December 11, 1950, and submitted to her the written consent for the adoption, with the petitioners' and the child's names omitted, which Mrs. Keheley signed. It was a condition of the adoption that Mrs. Keheley should not see the child or know who the adopting petitioners were. Mrs. Keheley testified that she was taking sedatives to relieve the pains following birth and did not remember much of what occurred on December 11, 1950, while Mr. Ben Camp testified that she appeared normal, and that he didn't know she had taken drugs. He filed the adoption petition on December 15, 1950.

Mrs. Keheley went back to work on February 2, 1951, at a salary of $2650 per year, as a stenographer. In March, 1951, she wanted her child back. She and Mr. Keheley resumed cohabitation as hubsand and wife on May 15, 1951, but they separated again on June 9, 1951. During this period, they learned who the adopting parents were, and went to see them about getting their child back. Mrs. Keheley withdrew her consent and filed her objections to the adoption on June 19, 1951, but William Keheley's consent to the adoption was obtained on June 26 and was filed on July 12, 1951.

Both Mrs. Keheley and the Koonces appeared to be able to support the child. Both the adopting and the natural parents had had previous unsuccessful marriages; the present marriage of the Koonces appeared to be a happy one, although they had been married for only two years, while that of the Keheleys had resulted in separation on two occasions.

The report of the Fulton County Department of Welfare on March 7, 1951, states in part: "The natural mother feels that she cannot make a suitable plan for the child and desires adoption of the child by the petitioners. The natural father states that the adoption placement was arranged without his knowledge. He is not in accord with the adoption and plans to contest it. . . The natural father plans for the child to live with his sister and

brother-in-law. He states this couple cannot have natural children and could provide a good home for the child. It does not seem that the adoption of the child is for his best interest until the natural father's legal claim to the child and normal fitness to have custody are clarified." A subsequent report stated in part: "The natural mother and father have been separated since June, 1951. We talked with him May 18, 1951, and he was in accord with the adoption. Subsequently we talked with him briefly and ascertained that he frequently visits Robert [the child in question], and thus we gained the impression that he has not really relinquished the child. We wonder if this will not cause conflicts in the child's parental relationships. . . The natural mother . . has not heard from the father since their separation and has no plans to return to him. She has visited the petitioners twice and saw the child on one of these visits. We understand from the natural father that he has visited the child on numerous occasions."

Thus it appears that when the consent was given, two days after the birth of her child, and also during her pregnancy prior thereto, Mrs. Keheley was not only in delicate physical condition but was also subject to psychological stress and mental anxiety, certainly more so than an expectant mother who may be comforted by the presence and support of her husband. Mrs. Keheley's husband, the father of the expected child, was not with her, and her marriage to him was bigamous or at best of questionable validity, depending on whether his previous undissolved marriage was itself void. Seeking counsel, she was informed that her child would be illegitimate and so would bear the stigma which yet attaches to bastardy. Without funds or means of support, she was called over the telephone by a person who was not licensed as a child-placing agency, and she was promised payment of her medical and hospital expenses in connection with the birth of her child if she would consent to the adoption of the child by the petitioners, who would give the child a home and a name. The consent was signed two days after the birth of the child, when the mother's physical condition required her to remain in the hospital.

Section 17 of the act of 1941 (Ga. L. 1941, p. 309; Code, Ann. Supp., § 74-421) provides: "It shall be unlawful for any person,

or persons, organization, corporation, hospital, or association of any kind whatsoever which has not been established as a licensed child-placing agency by the State Department of Public Welfare or by one of the superior courts to advertise in any periodical, by radio, or any other public medium, or *by any private means* including letters, circulars, hand-bills, and oral statements, that they will adopt children or place them in foster homes, or *hold out inducements to parents to part with their offspring,* or in any manner knowingly to become party to the separation of any child, from its parents or guardians except through the provisions of this Act." (Emphasis added.) And, although the inducements securing the consent come from a third party, so long as they prevent the free exercise of the parents' will, it is the duty of the court to deny the adoption. *Allen* v. *Morgan, 75 Ga. App.* 738, 746 (44 S. E. 2d, 500). Such influence as was exerted in this case, not being countenanced by law, may be considered undue, taking also into consideration the emotional condition of the mother, her lack of means, and her wrong impression with regard to the illegitimacy of her child.

Many of these circumstances were changed after the birth of the child and the signing of the consent in question. William Keheley returned and, for a short time, lived with Mrs. Keheley as her husband after the removal of his impediment by the dissolution of his previous marriage. This created at least a presumption of the validity of their marriage. *Smith* v. *Reed,* 145 *Ga.* 724 (89 S. E. 815; L. R. A. 1917A, 492); *Addison* v. *Addison,* 186 *Ga.* 155 (197 S. E. 232); *Carr* v. *Walker,* 205 *Ga.* 1 (52 S. E. 2d, 426). Upon consulting other counsel, Mrs. Keheley was informed that her child was not illegitimate. See *Campbell* v. *Allen,* 208 *Ga.* 274 (66 S. E. 2d, 226); *Perkins* v. *Levy, 158 Ga.* 896 (124 S. E. 799); *Eubanks* v. *Banks, 34 Ga.* 407. She regained her employment at a salary of $2650 per year, and had some income from a property settlement for the support of her first child. In view of these changed circumstances, we think that Mrs. Keheley showed good and valid reasons for changing her mind with regard to the surrender of all her parental rights, powers, and duties, together with the child himself as the object of a mother's love.

The witness from the Fulton County Welfare Department

stated the policy of that agency: "We do not accept releases before birth; we do not accept them until sometime after the child is born because mothers do change their minds and we want to give them time in which to be sure they want to release the child." The act of 1941 (supra) in effect makes the Welfare Department a party to adoption proceedings, representing the State's interest in the welfare of the child, and this agency's practice in handling such cases bears weight. The same purpose may be gathered from the provisions of the adoption statute for a period of at least 75 days from the time the petition for adoption is filed before the interlocutory hearing thereon can be had (Ga. L. 1941, p. 302, sec. 5; Code, Ann. Supp., § 74-408), and for a period of six months from the date of the interlocutory order before the final hearing. During this period of settlement and trial, the petitioners could undoubtedly have dismissed their petition if they had decided that the adoption was not desirable. Since doctrines of estoppel are not applicable in adoption proceedings (*Allen* v. *Morgan*, 75 *Ga. App.* 738, 749, supra), the same privilege of withdrawing consent to the adoption, prior to the final order, should be accorded to the natural parents as the petitioners have through their right to control the litigation. Be that as it may, the natural mother has shown in this case by the uncontroverted evidence, circumstances under which her consent was not freely and voluntarily given, with full knowledge of the facts, but was obtained under the circumstances above related, and also has shown a change in her circumstances after her consent was given which constituted good cause for withdrawal of her consent. Her valid consent was a prerequisite to the validity of the adoption. *Allen* v. *Morgan*, supra. We think that the trial court exceeded and abused its discretion in granting the adoption without the consent of the natural mother of the child sought to be adopted.

*Judgment reversed. Felton and Worrill, JJ., concur.*