37615. HENDRIX *et al. v.* HUNTER.

DECIDED JUNE 17, 1959—REHEARING DENIED JULY 8, 1959.

786

*Harold Sheats, Scott Walters, Jr., Paul Webb, Jr.,* for plaintiffs in error.

*Eugene S. Taylor,* contra.

NICHOLS, Judge. ■ The plaintiffs in error contend that the court dismissed the proceeding on the ground that under the circumstances of the case the consent to the adoption by the mother was not binding on her and failed to consider the case on its merits, the contention being that the basis for the court's ruling on the question of consent was erroneous. The basis for the contention is that the trial judge, at the hearing on December 10, 1958, said orally: "In other words, the court is ruling that the original consent agreement or any agreement and the agreements made prior to the birth of the child are null and void as against public policy, and that the consent that was signed in the hospital, I believe, a day or two whenever it was, after the birth of the child is not regarded as binding or effective under the facts or circumstances of the case."

Under the repeated rulings of this court and the Supreme Court the statement of a judge before entering judgment as to reasons for the judgment, which are not embodied therein, cannot be considered as a part of the judgment. *Sachs v. Yasaitis*, 92 *Ga. App.* 778 (90 S. E. 2d 49), and cases cited; *Construction & General Laborers Union, Local* 246 v. *Williams Constr. Co.*, 212 *Ga.* 691 (95 S. E. 2d 281).

■ The contract entered into between the natural mother of the child and petitioners for adoption, and the consent by the natural mother to the adoption are as follows: The contract: "This contract and agreement between Amos Ellison Hendrix and Nina Robinson Hendrix of the first part and Sarah Hunter of the second part, Witnesseth: Whereas, it is the desire of the parties of the first part to adopt the unborn child of the party of the second part and it is the desire of the party of the second part that such adoption take place, it is therefore agreed between the parties as follows: 1. Party of the second part hereby agrees to said adoption. 2. Parties of the first part hereby agree to pay the hospital and doctor bills in connection with the pregnancy of the party of the second part and to pay her board during pregnancy. In witness whereof the parties hereto have hereunto set their hands and affixed their seals this 25th day of February, 1958. [signed] Amos Ellison Hendrix, Nina Robinson Hendrix, Sarah Hunter." The consent to the

adoption signed by the mother on the same day that the contract was signed is as follows: "Personally appeared, before the undersigned attesting officer, Sarah Hunter, the subscriber, who hereby consents and agrees that her unborn minor child, due to be born about the 15th day of April, 1958, be adopted by Amos Ellison Hendrix and Nina Robinson Hendrix. The undersigned hereby affirms that she is unwed. [signed] Sarah Hunter." On June 6, 1958, one or two days after the birth of the child, the mother executed a second written consent to the adoption of the child which reads as follows: "The undersigned Sarah Elizabeth Hunter, hereby consents for Nina Robinson Hendrix and Amos Ellison Hendrix, to adopt Bob Stanley Hunter the minor child of said undersigned, and consent for adoption proceedings to be instituted in accordance with the Georgia Adoption Law of 1941. This 6th day of June, 1958. [signed] Sarah Elizabeth Hunter." The evidence showed that the petitioners complied with their agreement in the contract to pay the hospital and doctors bills in connection with the pregnancy of the mother and to pay her board during pregnancy. The child was born about four months after February 25, 1958, and so far as the record shows, the mother did see the child before she left the hospital and returned to her home in Alabama. It was held in *Savannah Bank & Trust Co.* v. *Hanley,* 208 *Ga.* 34 (65 S. E. 2d 26), that a contract to will property to the mother of a child in consideration of the consent of the mother to the adoption was void as against public policy. It is to be noted, however, in the *Hanley* case, that the property to be willed was to go to the *natural* mother, not the child, and for the courts to approve such a contract might well amount to the condonation and approval of the barter and sale of children. Such are not the facts before us here. There was no material consideration moving to the *natural* mother in the case sub judice, but the only benefits she received were secondary, indirect and incidental to the prenatal care of the then unborn child.

The prime objective in the case at bar was the safe, normal delivery of as healthy a child, for the adoptive parents to adopt, as the mother, with the aid of medical science could bear, and in order to promote this objective the adoptive parents agreed to

furnish prenatal care, medical and otherwise. Such consideration in the form of prenatal care, as the mother received here, was purely the result of and incidental to the birth of the child, and by no means, do we think, could be construed to be such material consideration as contemplated in the *Hanley* case, supra, for there the agreement was for the adoptive parent to leave property by will to the natural mother and brothers and sisters of the adopted child.

The Supreme Court of this State has held that such a contract as we have under consideration here, is binding and enforceable. In *Savannah Bank & Trust Co.* v. *Wolff,* 191 *Ga.* 111 (11 S. E. 2d 766), the Supreme Court held, "Where the mother of an infant girl . . . agrees to surrender and does actually surrender the child . . . to a third person for the purpose of having the child adopted by him . . . and said third person in turn agrees to adopt, care for, and rear the child and leave to her [the child] one-half of his estate by will, a contract arises mutually binding and enforceable on both sides." See in this connection, 57 Am. Jur. 173, § 195; 68 C. J. 571, § 189; 94 C. J. S. 866, § 113 (1); Annotations in 15 A. L. R., p. 223; and 142 A. L. R., p. 84.

From what is above stated and the authorities cited, the adoption contract entered into between the natural mother and the adoptive parents is not void as against public policy, but is a valid, binding and enforceable contract.

■ Having held the contract between the parties to be valid, we are now confronted with the proposition as to whether or not, under the 1957 amendment to the adoption law (Ga. L. 1957, p. 367) which provides that when consent to adoption is given freely and voluntarily it may not be revoked by the parents, as a matter of right, and wherein the caption of said amendatory act, is stated . . . "so as to restrict the parents' right to revoke their consent to adoption proceeding after said consent has been freely and voluntarily given . . .", the trial judge was, under the evidence, authorized in holding that the circumstances in this case supplied sufficient reason and justifiable cause for the withdrawal of consent by the natural mother. We do not think the evidence supports the holding. In the first place the natural mother admits that the consent agreements executed by her,

both before and after the birth of the child, were freely and voluntarily made; that she realized fully what she was doing at the time. Moreover her consent agreements were not given in either instance gratuitously, but rather were executed in compliance with a valid contract, based upon good and legal consideration and fully performed by the adoptive parents. It is also to be noted that there is not the slightest hint in this case of any fraud or undue influence being brought to bear by anyone, and it is conceded by the natural mother, and so stipulated in the record, that the adoptive parents are fit and proper parents, both morally and financially to have the care and custody of the child.

There is no evidence in the record of a subsequent marriage by which the infant child would be legitimized, as was done in the cases of *Keheley* v. *Koonce*, 85 *Ga. App.* 893, 897 (70 S. E. 2d 522) and *Wheeler* v. *Howard*, 211 *Ga.* 596 (87 S. E. 2d 377). But, contrarily, the natural mother here testified that she would probably never marry; that she expected to spend the remainder of her life unmarried and working as a waitress in the restaurant where she was presently employed and where, in the back portion of same restaurant, she made her home, and where she planned to take and rear her child. By so declaring her intentions to never marry, this natural mother foreclosed the only hope of ever removing the stigma of illegitimacy from her child, except by adoption. Does the law of this State, as amended, permit natural parents to also close the door on this one last avenue of escape for these unfortunate children by permitting the natural parents to withdraw consent to adoptions, freely and voluntarily given, when based upon such weak, flimsy and unstable whims as enumerated and assigned as reasons for withdrawal of consent by the natural mother in this case? We do not think so. Rather it is the opinion of this court that the General Assembly, when enacting the 1957 amendment to the adoption law, had just such a case in mind as we have under consideration here.

In the final analysis of the evidence in this case the only real reason ever given by the natural mother for withdrawing her consent was that she changed her mind. Of course the

record reveals that she had never seen the child before agreeing to the adoption, and while it is true that the welfare agencies prefer that mothers of illegitimate children see their offspring before consenting to adoption, the mere fact that in the present case the natural mother consented to the adoption before seeing her offspring would not permit her, as a matter of right, to repudiate a contract under which her child had received valuable benefits, and to withdraw her consent.

While it is also true that it is certainly best for all concerned that the natural mother not know who the adoptive parents are, and while it is generally true that welfare agencies will not recommend adoption where such is the case, nevertheless, such knowledge on the part of the natural mother is not, in and of itself, sufficient cause under the circumstances in this case to withdraw her consent.

The Circuit Court of Appeals for the District of Columbia in the case of In Re Adoption of a minor, reported in 144 F. 2d 644, a case very similar on the facts to the case before us here, in interpreting and construing the adoption statute of the District of Columbia, which was designed to protect the adoptive parents and the adopted child, and which statute is not dissimilar to our adoption law, as amended, here in Georgia, has very eloquently expressed our views on this subject, and we think it well at this point in this decision to quote a portion of that splendid opinion, which obviously is graphically pertinent to this case: "Obviously, the problem and the need for remedial action is greater in the case of illegitimate children than of others. The child, who from its first awkward years, has been excluded from normal friendships and associations, who has known the disapproval of the unco guid, develops, first, a complex of fear and frustration, followed by resentment against the dominant group in organized society which permits such treatment. The illegitimate child is the visible evidence of transgression against religious and moral standards. Our forebears used to destroy inanimate objects which chanced to be agents of misadventure, or forfeit them as deodands. Similarly these unfortunate offspring of romantic intemperance have been made whipping boys for vicarious repentance. As infants they have

died in far greater proportion than their legitimate brothers and sisters; those who survived have worn the scarlet brand. It goes without saying that such people are more apt to become a burden upon organized society than cooperating members of it. The large percentage of illegitimate births in the general total is unknown to most people, and is startling in its potentialities.

"It was with all these considerations in mind that Congress repealed the old statute and enacted a new one for the District of Columbia, carefully designed to protect adoptive parents as well as the adopted child; to close the records against inspection, in order to avoid future embarrassment and humiliation; to make available the services of the Board of Public Welfare, or other qualified agencies, to assist the court in its determination; to empower the court to make appropriate rules which will bring fully before it the interest of all proper parties; and, if necessary, to retain control of the case through entry of an interlocutory decree which, in turn, may be set aside for cause shown. It is apparent that if, in particular cases, the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated, doctors of medicine and of divinity, potential adoptive parents and social workers would be stymied in their rehabilitative efforts. A premium would, instead, be put upon the emotional instability which produces illegitimates; to say nothing of the possibilities for racketeering which such an interpretation of the law would put in reach of those who may be criminal in their tendencies, as well as lacking in the qualities of parenthood. The new law cannot prevent illegitimacy, or remove its stigma, generally, but to the extent that it may secure desirable placement of even a few illegitimate children, it may avoid some of its most dangerous results. But to do so, it is necessary that such children and their adoptive parents be protected against possibilities of the kind suggested. Especially in the adoption of illegitimate children, it is desirable that the break between infant and consenting mother be abrupt

and final. The number of children who are housed in asylums or boarded out at the expense of the public is evidence enough of the problem and of the need. These are the considerations which must be kept in mind in interpreting and administering this law."

We are of the opinion that the trial court in this case either did not exercise his discretion, or if he attempted to exercise it, he abused it.

In view of what is stated above the contentions of plaintiff in error that the trial court, after denying the application for adoption, was without authority to enter an order taking the custody of the minor child from the applicants, and awarding same to the natural mother now becomes moot and will not be passed upon.

*Judgment reversed. Gardner, P.J., Townsend and Quilliar, JJ., concur. Felton, C.J. and Carlisle, J., dissent.*

FELTON, Chief Judge, dissenting. I dissent from the judgment of reversal and from all of the rulings of the majority except the ruling in division 1 of the opinion.

■ The contract between the mother and the adopting parents is void as being against public policy. I do not agree that the contract was made by the mother primarily for the benefit of the child. I think the exact opposite is true and to me it is too obvious to require debate. The consideration in *Savannah Bank & Trust Co.* v. *Hanley*, 208 *Ga.* 34 (65 S. E. 2d 26) flowed to the mother. Monetary consideration to a mother, or its equivalent, which forms the basis of an adoption contract, vitiates the agreement. Once the door is open to this kind of an agreement the floodgates of racketeering and fraud will soon be wide open. The best thing the courts can do is to stop this kind of a trend in its starting tracks. Neither the case here, nor the *Hanley* case, supra, is similar to *Savannah Bank & Trust Co.* v. *Wolff*, 191 *Ga.* 111 (11 S. E. 2d 766) cited by the majority.

■ The majority opinion at least implies that the mother cannot withdraw her consent because of the binding contract. Adoption contracts are not custody contracts, and stand on a different footing. Assuming that the contract is not void as against public policy, an adoption proceeding is not a vehicle

of the law for its enforcement. It was made in contemplation of adoption and when an application for adoption is filed the applicants submit themselves to the full jurisdiction of the adoption laws and procedures, and a contract to adopt is relevant only on the question of consent. *Allen* v. *Morgan*, 75 *Ga. App.* 738 (44 S. E. 2d 500). The fact of a valid consideration is no bar to the right of a party to withdraw consent so far as the adoption proceeding is concerned. Even since the 1957 amendment parents may still withdraw consent for good cause and all parties to a contract to adopt are charged with such knowledge. The law would not regard a parent who had cause to withdraw consent as a defaulting party so as to estop him or her from withdrawing consent. We are not here dealing with a custody contract on a habeas corpus or other kind of proceeding nor a case where specific performance of a contract to adopt is involved.

■ I think the majority has consciously or unconsciously delved into a phase of this case that is in no wise involved in this appeal, to wit, the question of the best interests of the child. Where there is no parental consent or where it is withdrawn for good cause, the question of the welfare of the child is never reached. The court in this case dismissed the proceedings at the interlocutory hearing. This can mean but one thing and that is that the court found that the mother had good cause to withdraw her consent. Otherwise the proceeding would have been permitted to pursue its regular course to the final hearing where all matters, including the welfare of the child, would have been determined. We cannot decide this case correctly unless we isolate the one issue and decide it. The only issue here is whether the mother had good cause to withdraw her consent. She admits that she originally gave her consent freely and voluntarily but she showed a change of circumstances which authorized a withdrawal of the consent. And I repeat, the welfare of the child can play no part in the decision on that issue. An unwed mother has as much right to her child as a wedded mother and we have to accept that fact without regard to anything else except the right to withdraw consent. The evidence showed that the mother signed the contract and entered into one consent

four months before the birth of the child and that she signed the last consent two days after the birth of the child without having seen it. The evidence showed that the mother and father of Sarah Hunter lived on a farm in a small country town; that her father was 67 years old and a pastor in a church; that she had four sisters and brothers, most of whom were married and none of whom had ever been in trouble before; that she did not wish her parents to know about her predicament and be hurt and embarrassed by reason thereof; that she was worried and upset emotionally and returned to Alabama immediately upon the birth of the child and refused to stay in Atlanta with the Hendrixes because she knew she would want to see the baby if she stayed; that her mother and father had already found out about her trouble and were willing to provide the child a home. Miss Hunter testified as follows: "Mother and them did come to me and tell me if I didn't want to make my home with them they would give the baby a home. I told Mother and Daddy, I said, 'well, I figure if I can get him back to love myself, I would rather have him there where I work at to love. You don't know what love is until you have one and lose as much sleep over it as I have.' Time after time I have wanted to get close to him, bring him up beside me and tell him I am his mother; I have done wrong I admit I done the wrong thing. I was trying to keep Mother and Daddy from being hurt. I figured I was big enough to wear it off myself . . ." Considering the above evidence with the nature of the contract, the condition of the mother before the birth of the child and shortly thereafter and the fact that she agreed to the adoption before the birth of the child and without having seen it, I am of the opinion that the court was authorized to find that the mother had sufficient cause to withdraw her consent. *Keheley* v. *Koonce,* 85 *Ga. App.* 893, 897 (70 S. E. 2d 522). Since the court was authorized to dismiss the proceedings because the mother had the right to withdraw her consent under the circumstances, the judgment dismissing the proceeding should be affirmed. *Murray* v. *Woodford,* 86 *Ga. App.* 273 (71 S. E. 2d 275).

■ The question of free and voluntary consent was not in this case. That was admitted by the mother. Without free

and voluntary consent the new 1957 law has no application. In my judgment the 1957 law does not take away from a parent completely the right to withdraw consent. Otherwise it would have so provided. The fact that consent was given before the birth of the child and before the mother saw the child might not in and of itself be against public policy, but that fact can certainly be taken into consideration by a court in determining whether the withdrawal of consent is authorized. Such a practice is forbidden by some welfare agencies which fact in itself is a matter for a court's consideration. The quotation from In Re Adoption of a Minor, supra, contained in the majority opinion was not written by the court on the question of the welfare of an illegitimate child. It was written to explain the District of Columbia Act on adoption concerning the sole question whether a parent could withdraw consent as a matter of right. The recommendations of agencies and doctors to the trial judge were based on the opinion that the parent could withdraw consent as a matter of right and the trial judge's ruling was based on that hypothesis. All the appellate court did was to rule that the parent could not withdraw consent as a matter of right, by a mere change of mind without good reason. In that case the parent offered no good reason, and the trial judge's judgment was reversed.

■ Assuming the validity and binding force of the contract as one for adoption and consent thereto, an adoption proceeding is all-inclusive and is more comprehensive than a simple custody question, and when a married couple seeks to adopt a child under the circumstances such as we have in this case, they lay all of their fortunes in the judgment of the judge deciding the questions raised by the adoption petition, and one of these fortunes is the disposition of the child's person. The custody of the child in this case was taken from the mother not under a custody agreement but under a contract for adoption, and such a custody was based on a consent which was binding at the time, which the plaintiffs in error were charged with knowing might be revoked for good cause at a later date. To say now that the court in this case could not restore the child to its mother would rob the court of its power to render a valid and

binding judgment after hearing the case and would render his efforts to do justice absolutely futile and no more than an empty gesture. We think that under the circumstances whatever rights to custody the plaintiffs in error had they surrendered to the court in submitting to it their petition for adoption and agreed that his judgment in the case would finally conclude all questions properly and legally decided, including the custody of the child.

*Carlisle, J., concurs in the foregoing dissent.*