**In re ADOPTION OF MASON.**

No. 69-8148.

Circuit Court, Broward County.

May 28, 1970.

</div>

James P. O'Flarity, Fort Lauderdale, for the petitioners.

William F. Poling, Fort Lauderdale, for the respondents.

LAMAR WARREN, Circuit Judge.

*Final judgment:* This cause is before the court on writ of habeas corpus issued on the petition of J. W. Blackshear and his wife, Joan Mason Blackshear, and the return to the writ by the respondent, Rebecca Clark.

On January 8, 1965, the respondent, who was the natural mother of the child, James Elliott Mason, delivered the custody of the child to the petitioners, at the same time executing under oath a consent for adoption by the Blackshears, who live in Georgia. Mrs. Clark was formerly married to the brother of Mrs. Blackshear, divorcing him in 1964 in Georgia, when the child was a few months old.

The Blackshears subsequently cared for and reared the child, called Jimmy, in their home until October 12, 1969, when upon a pretext the mother obtained the child from the home of the Blackshears and brought him to Florida. He is now eight years old.

Based on the above consent of the natural mother, and one obtained of the natural father, the Blackshears thereafter instituted adoption proceedings in Georgia. On April 2, 1970 a final order of adoption was entered, which found that the natural mother was

duly served, personally and in accordance with the statutes made and provided in such cases, and further, that "she made an appearance by filing pleadings in this case." The court further found that the petitioners were fit and proper persons to be awarded the child, and that they had "generally exhibited an exemplary parental attitude toward said child."

The respondent's return to the writ, submitted at hearing, raised the issue of revocation of her consent prior to the institution of adoption proceedings by the Blackshears, and denied that she was wrongfully withholding the child from petitioners.

Called as an adverse witness, Mrs. Clark testified that she moved from this area after suit was filed and now lives near Winter Haven with her four sons, each of whom being the product of a different marriage. She plans a divorce from her last and fourth husband, who is presently charged with crime. She is employed as a waitress and cashier. Her sister helps her with the children, whom she pays for babysitting. The children are twelve, eight, six and four. Her salary is fifty to sixty dollars a week, plus tips.

Shortly after she obtained her son on a subterfuge, she testified she called the Blackshear home and, in speaking with the Blackshear's eighteen-year old son, she stated that she was sorry she had to get her son that way but that he was hers, she was taking him back, and she was not going to let them adopt him. She also testified that when Blackshear came to Florida several days after she had taken the child she told him about the same thing, that she was sorry she had to do it that way, but that they had him four to five years and made no attempt to adopt him, she was sorry to hurt them, but she was revoking her consent. She further stated that the revocation was oral, and that she did not advise the court in Georgia that she was revoking her consent.

She wrote for her son's birth certificate and they sent it to her. She wrote back and asked if they had any evidence of an adoption, and they did not have any record. Atlanta told her the same thing.

On January 5, 1965, Mrs. Clark wrote from Florida —

> "Dear Joan & J. W. . . . thought about what you said, about letting you have Jimmy, Well I have thought it out & you are right you can do so much more for him than I can. I will sign a paper to where you can have him. I work all the time & I never have any time to give them the love they need, I believe it will be better for thm to be where they will have someone with them all the time & not a baby sitter . . . I don't want my kids to have to worry about a home or

tomorrow & with you I know Jimmy will be happy he cried all the way down here, cause he wanted to be with you. I ask him did he want to go stay with you & he said "Yep". I know he will be happy & he is young enough to grow up thinking you are his mother, all I want is to see him some, I won't mess with him any more after you get him . . . You will have to come & get him . . ."

The petitioners picked up Jimmy in Davie, Florida, January 8th. She testified that during the time, nearly five years, that the petitioners had the boy she saw him three or four times.

She was served with a notice of the adoption proceeding, and she filed some papers through her attorney.

Jimmy was born with a club foot. Mrs. Clark could not do anything for him while she had him because she did not have the money. The Blackshears however had his foot operated on through the Georgia Crippled Children agency, and he was under treatment while the petitioners had him. She took him to Easter Seal, who said he only needed a special shoe, but didn't need treatment at that time. She just took him once. He wears a special shoe, which the Blackshears forwarded to Mrs. Clark after she got him. She testified he was doing well in school.

Mr. Blackshear's testimony was to the effect that he operates a fairly large farming operation in Georgia. He also drives a school bus. He is active as an officer in his church. He and his wife have two daughters, ten and fifteen, and a son who is eighteen.

He had told Mrs. Clark not to bring Jimmy back any more if she was not going to give them the child because they did not want to be hurt. Upon receiving her letter, he went to another lawyer — his lawyer was off that day — and got the consent prepared. When they came down here in 1965 to get the boy they were on the road all night; at the time Jimmy had practically no clothes.

The child's foot was turned left at birth, his heel wouldn't touch the ground, and he ran on the ball of his foot. When the witness got the boy he had had no treatment except that when he was born a cast was put on the foot. Blackshear begged the doctor to put the child on the crippled children's program, which he did; they worked for a year trying to straighten the foot; the child was in Atlanta for three and a half months receiving surgery and hospitalization. He has an appointment to take him back. The surgery in Atlanta was about two years ago, before school. The foot was good and well when he started school. When he came home he was on crutches, and slept with a corrective shoe on. When she picked him up October 12, 1969, they sent the special shoe for him to sleep

with. Jimmy was in the second grade; his work was satisfactory. When he came from Atlanta he was being checked every month. Since he was picked up they got a card to bring him back for a check-up.

When he got the consent he thought he was in the process of adoption, but he found out after Mrs. Clark got him that he did not have his adoption papers completed. He thought he only had to get his name changed; thought the boy was his legally.

While they had the boy she came only one time to see him; the next time she picked him up.

He is forty-six. He did not pay anything on the operation, but they had expenses of travel and clothes. His wife spent a good deal of time with the boy.

When they got the paper fixed for her to sign, the lawyer said if she signed the paper she would not be able to get him back. They thought he was adopted until he got to talking around with the lawyers; he thought because she signed the paper she could never touch him again, that the boy was theirs.

She had let him have the child before, the first time was after she was divorced. When she got the child he was away from home. His son took the call from her. She spoke to his son, she said she hated to do it this way, but he was hers, he belonged to her, and she was going to take him. His son did not say anything about revoking the consent.

He caught a plane down here, and asked her to please let him take the boy back home. She never said she was revoking the consent. When he came down his lawyer had started adoption proceedings. After he returned he signed the petition and had it filed. He already thought the boy was his.

Mrs. Blackshear testified similarly, stating that after the divorce, Mrs. Clark would let the child stay with them three or four days at a time at least once a month; one time he stayed a week, another time a month. They loved Jimmy; he always seemed like her child. They heard from her in January, 1965. When the letter came, they talked to the minister, who advised them about a lawyer. They left their home for Florida before dark.

When they got the child there was only dry cereal in the house, no milk; relatives gave the witness clothes for the boy. Mrs. Clark came to see the boy about a year and a half later, and no more until she picked him up. While the boy's foot was being taken care of Mrs. Clark did not come to see him, did not write, and did not call. They wanted the work done before he entered school;

when he returned from Atlanta he went to a clinic once a month and had special exercises every night; he wore a corrective shoe.

Her children loved him, he was happy with them, and the Blackshears treated him like he was one of theirs.

She was under the impression the child was theirs; he was theirs as far as she was concerned, her son never told her Mrs. Clark said she had withdrawn her consent, only that she was not bringing him back, she hated to do it that way, but she was taking him.

The evidence of the ordinary of Randolph County, Georgia, of a farmer and county commissioner, and of a banker, all three from the area in which petitioners live, in their depositions, received in evidence without objection, is that (by the ordinary) Blackshear is a good family man, his character and reputation in the county is good, he is considered a sober man, he is a good citizen; (by the county commissioner) he has a comfortable country home, his character and reputation is all right, he has no problems with alcohol, he seems like a good husband and father, his home was clean and orderly, the little boy seemed to be happy, they looked out for him better than they did their own, Mrs. Blackshear is a good mother and housekeeper, they are good citizens; and (by the banker) their character and reputation is good, from thirty years observation Blackshear was not known to be under the influence or gave any indication that he had been drinking or shown by any evidence that he had been drinking, he was an adequate provider, his children are well dressed and seem well adjusted and happy, Mrs. Blackshear is a good mother, they are good citizens, they go regularly to church.

The respondent, Mrs. Clark, testifying on her own case stated that in January, 1965, she could not support the children. Her husband had not been paying her any support money. After she wrote her letter, the Blackshears came down and brought the consent, which she signed. The house she lives in at the present time is a three-bedroom, one-bath house, with a big yard. She is able to support the children.

When she went up to get the boy he said he wanted to come back with her. She had found out they had not made any attempt to adopt him, and that he was still hers and that she could get him back, so she revoked her consent. When J. W. came down he asked if he could have him back and she told him she was real sorry, she loved the boy, she was sorry she had to hurt them so bad, they had their three kids, let her raise hers.

Every time she mentions he might have to go back, the boy starts crying, and says if he has to go back he will run away; for her

not to tell him he has to go back and let J.W. come in drunk and then start fighting.

She was aware that this had hurt the Blackshears very deeply after keeping the boy over a period of five years, but J. W. promised her they would write and send pictures and that she could come to see him anytime; he said that one day he might not be able to support him and she could have him back. When she went there they would treat her like she wasn't welcome.

Mrs. Clark's deposition was received in evidence and the court has examined the same. Among other matters, she testified she decided to go and get the child back when she found out he wasn't adopted. She did not contact the Blackshears because he was her son and they didn't adopt him and she had a right to have him back; if they wanted him so bad they should have adopted him; he was up there four or five years "and they didn't make no nothing to go ahead and adopt him." When she called, after taking the child, she told their eighteen-year-old son that she was taking the boy home with her, he was hers, he belonged to her, to tell Joan and J. W. she was sorry; she had to do it this way because he was her son.

He is doing real good in school. She has seen Blackshear drink.

In response to when and where did she withdraw the consent, she stated, "I'm withdrawing it now. I'm withdrawing it when I got my son or when I found out he wasn't adopted, and I withdrew it."

The court talked to the child in the absence of counsel and the parties. He did not want to go back because he liked it better with his family. The court also received the impression that the proceedings had frightened the child.

Section 74-403, Ga. Code Ann., provides, "Except as otherwise specified in the following subsections, no adoption shall be permitted except with the written consent of the living parents of a child. Said consent, when given freely, voluntarily, may not be revoked by the parents as a matter of right." The subsections are inapplicable to this decision.

In Hendrix v. Hunter, 110 S. E. 2d 35, the lower court had sustained the objections to adoption of the natural mother and dismissed the application for adoption after considering the evidence and the argument thereon. In reversing, the court held that the evidence did not justify the right to revoke the consent, noting that the consent was given freely and voluntarily, that the mother realized what she was doing, that there was no hint of fraud, and that the mother conceded that the adoptive parents were fit and

proper parents. The court further commented that, "In the final analysis of the evidence in this case the only real reason ever given by the natural mother for withdrawing her consent was that she changed her mind." This decision was subsequently cited in Ritchie v. Dillon, 118 S. E. 115, upon the right to withdraw a consent.

In a habeas corpus proceeding, Queen v. Ballew, 142 S. E. 2d 841, the record showed that the mother had given her child for adoption to respondents who were of good character, owned a nice home, and were financially able to care for the child; she signed the agreement for adoption freely and voluntarily. Referring to the statute (quoted above), the court held there were no circumstances shown in the case to support the contention that the trial judge erred in refusing custody to the mother.

The facts in Smith v. Smith, 162 N.E. 2d 379, reflected that after a petition was filed to adopt two children, the mother executed a document in which she attempted to repudiate her prior consent to the adoption. In its holding the court concluded that the trial court properly held that the attempted repudiation showed no valid ground, stating that, "The change of mind of the mother was not legal cause for revocation." The court further ruled that a delay of fourteen and one half months between the consent and the filing of the adoption proceeding did not render the consent ineffective due to lapse of time. In that case delay was explained as resulting from an investigation by international welfare authorities; also, the evidence showed part performance of the adoption agreement in that petitioners had provided funds for transportation of the children with an attendant, and had then assumed the care and support of the children. Here, the delay was explained by ignorance of the petitioners of the requirements of adoption proceedings, probably resulting from the preparation of the consent by one other than their regular attorney, who was out of his office. Additionally, here the petitioners amply partly performed in the nearly five years they had the child by their care of and solicitude for the child.

The respondent relies heavily upon the decision in Fielding v. Highsmith, 13 So.2d 208, particularly calling attention to headnotes four through six, in which case it was held that the order of adoption was invalid for failure to obtain a consent from the father or give notice of the proceedings. The foster parents, nevertheless, were given custody, the court stating that —

"This is a habeas corpus proceeding brought primarily to determine the custody of a minor child, even though in the process the validity of the adoption proceedings is incidentally

involved. In such proceedings the moral, intellectual and material welfare of the child are the matters of chief importance, and the infant should be placed where its interest will be best subserved, without regard to the validity or invalidity of the adoption proceedings. Of course all things being equal, the legal right of the father will generally prevail. But the rights of the parents are not absolute; many other factors must be taken into consideration. The ties of nature and of association, the character of the applicant for the child, its age, health, and sex, the moral or immoral surroundings of its life, the benefits of education and development, and pecuniary prospects, as well as many other considerations, enter into the judicial determination."

Also argued by the respondent was the case of Neal v. State, Fla., 135 So.2d 891, particularly, headnote eleven. This decision, which involved a Mississippi decree awarding custody of a child to grandparents and which became the subject of habeas corpus proceedings in Florida found the view to be in Florida that in custody proceedings a decree of a foreign jurisdiction involving that issue should give way to a decree based upon the best interest of the minor involved; and that in habeas corpus proceedings the welfare of the child is one of the controlling considerations, and the court in the exercise of its discretion may award custody to such of the parties as the best interest of the child may require, taking into account at all times the right of the natural parent in the premises.

A case similar to the facts under consideration is Day v. Nelson, Fla., 213 So.2d 497, wherein the mother for economic reasons placed two small children in the custody of others, where they remained substantially for a number of years, and then sought their return by habeas corpus. After hearing the writ was discharged upon a finding of the best interests of the children.

There has been no valid attack herein upon the jurisdiction of the Georgia court to enter its final judgment of adoption; it shows no irregularities upon its face.

The court therefore finds as follows —

(1) That the consent to adoption was given freely and voluntarily.

(2) That respondent had notice of the adoption proceedings in Georgia and made an appearance therein by filing pleadings.

(3) That there was no withdrawal or revocation of consent expressed either at the time the child was taken on October 12,

1969, or when the petitioner Blackshear subsequently appeared in Florida in an attempt to regain custody.

(4) The respondent's reasons for revoking her consent "as a matter of right" were insubstantial, and were because she changed her mind.

(5) That petitioners' delay in filing their petition for adoption was excusable under the circumstances, and gave the respondent no ground upon which to revoke her consent.

(6) That the evidence shows that the petitioners are fit and proper persons to have the custody of the child, and the moral, intellectual and material welfare of the child will be best served by placing it with them.

(7) The court is not convinced that the respondent is able to maintain a stable home life for the child and care for its needs, while the petitioners have that ability.

It is therefore ordered that the care, custody and control of the child, James Elliot Blackshear, is hereby awarded to the petitioners, J. W. Blackshear and his wife, Joan Mason Blackshear, and the respondent is ordered to deliver custody of said child to the petitioners forthwith.